UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN DOE 1, | |
| Plaintiff, | 18 Civ. 11324 (KPF) |
| v. | **OPINION AND ORDER** |
| EAST SIDE CLUB, LLC., JOHN DOE 2, and JOHN DOE 3, | |
| Defendants. | |

KATHERINE POLK FAILLA, District Judge:

Plaintiff John Doe 1, proceeding anonymously, brought this lawsuit more than three years ago alleging egregious, wide-ranging sexual harassment and discrimination by his former employers. From its inception, however, this litigation has been marked by the efforts of Plaintiff — with the witting or unwitting assistance of his then-counsel, Johnmack Cohen and the Derek Smith Law Group ("DSLG") — to conceal unfavorable facts, thus requiring Defendants to pursue multiple rounds of motion practice to obtain even the most basic information. Despite those efforts, the record in this case is littered with Plaintiff's false statements, half-truths, cover-ups, and misrepresentations. Indeed, once the extent of his perfidy had become clear, Plaintiff voluntarily dismissed his claims on the eve of trial. Now before the Court is Defendants' motion for sanctions pursuant to 28 U.S.C. § 1927, Federal Rules of Civil Procedure 11 and 37, and the Court's inherent powers. For the reasons discussed below, the Court grants the motion in part, and imposes sanctions against both Plaintiff and his former counsel.

## A.    Factual Background

### 1.    Plaintiff's Allegations

Plaintiff John Doe 1 worked as an attendant at Defendant East Side Club (the "Club"), a "social relaxation club for gay and bisexual men," during the approximate time frame of July 27, 2015, through April 7, 2017.  (FAC ¶¶ 9, 16, 39).  Plaintiff's job duties included greeting and escorting customers to their rooms and cleaning rooms and toilets.  (*Id.* at ¶ 17).  During Plaintiff's employment at the Club, Defendant John Doe 2 was the Club's manager, and Defendant John Doe 3 was the Club's owner and general manager.  (*Id.* at ¶¶ 10, 14).

In brief, Plaintiff alleges that shortly after he began working at the Club, Doe 2 began sexually harassing him — making sexually explicit remarks, touching Plaintiff inappropriately, and propositioning Plaintiff for sex — and

---

[1]    The facts stated herein are drawn primarily from the Amended Complaint, the operative pleading in this matter ("FAC" (Dkt. #23)), as well as from the declaration of Thomas D. Shanahan in support of Defendants' motion for sanctions ("Shanahan Decl." (Dkt. #129)); the declaration of John Doe 2 in support of Defendants' motion for sanctions ("Doe 2 Decl." (Dkt. #127)); the declaration of John Doe 3 in support of Defendants' motion for sanctions ("Doe 3 Decl." (Dkt. #126)); the declaration of Johnmack Cohen in opposition to Defendants' motion for sanctions ("Cohen Decl." (Dkt. #133)); the reply declaration of Thomas D. Shanahan in further support of Defendants' motion for sanctions ("Shanahan Reply Decl." (Dkt. #136)); the declaration of Plaintiff John Doe 1 in opposition to Defendants' motion for sanctions ("Pl. Decl." (Dkt. #140-1)); and all of the exhibits attached thereto.  The transcripts of conferences in this case are referred to as "[Date] Hr'g Tr."; deposition transcripts are referred to as "[Deponent] Dep."; and the parties' proposed trial exhibits are referred to as "Pl. Trial Ex." and "Def. Trial Ex."

For ease of reference, the Court refers to Defendants' amended memorandum of law in support of their motion for sanctions as "Def. Br." (Dkt. #128); Derek Smith Law Group's opposition brief as "DSLG Opp." (Dkt. #134); Defendants' reply brief as "Def. Reply" (Dkt. #135); Plaintiff's brief as "Pl. Opp." (Dkt. #140); and Defendants' sur-reply as "Def. Sur-Reply" (Dkt. #152).

states that this harassment caused him to suffer from depression and anxiety. (*Id.* at ¶¶ 18-24). Plaintiff alleges that, as a result of Defendants' behavior, he was constructively discharged on or around April 7, 2017. (*Id.* at ¶ 39).

A key issue in this case concerned the damages Plaintiff had allegedly suffered as a result of his employers' conduct. According to Plaintiff, he began seeking medical treatment on or about October 9, 2017, for the emotional distress that "he has suffered and is suffering from as a result" of Defendants' mistreatment. (FAC ¶¶ 43-44; *see also id.* at ¶ 43 ("Plaintiff continues to suffer long-lasting psychological affects as a result of Defendants' unlawful conduct.")). Plaintiff further claimed to have continuously required treatment for such emotional distress since that time. (*Id.* at ¶ 44). Specifically, Plaintiff alleged that as a result of the "severe emotional and physical distress" he experienced, he "has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits and other compensation which such employment entails, and Plaintiff also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses." (*Id.* at ¶ 46). Plaintiff "claim[ed] aggravation, activation, and/or exacerbation of any preexisting condition[,]" as a result of Defendants' conduct. (*Id.* at ¶ 53).

### 2. The Criminal Complaint Against John Doe 2

Plaintiff's disputes with his former employers ultimately played out in both criminal and civil arenas. In or around May 2017, Plaintiff filed a criminal complaint against Doe 2. (Def. Trial Ex. G; Cohen Decl., Ex. 1). In late May

2017, Doe 2 was charged by the New York County District Attorney's Office ("DANY") with three misdemeanors. (Cohen Decl., Ex. 1). Thereafter, Doe 2 was arrested and detained for two days, before being released on his own recognizance. (Def. Trial Ex. G). On November 20, 2017, DANY dismissed the criminal charges against Doe 2. (Def. Trial Ex. W). In submissions filed in this case, Defendants suggest that Plaintiff fabricated his sexual harassment allegations in anticipation of being fired from the Club, after Doe 2 repeatedly reprimanded Plaintiff at work for his unprofessional behavior and poor work performance. (Def. Br. 3). Defendants similarly contend that the criminal charges against Doe 2 were dropped after DANY determined Plaintiff was not credible. (*See id.* at 2-3; *see also* Def. Trial Ex. G).

### 3. The State Court Actions

Defendants responded by filing a civil action against Plaintiff in New York State Supreme Court, New York County, captioned [*John Doe 2* v. *John Doe 1*], Index No. 161069/2017 (N.Y. Sup. Ct. N.Y. Cnty.) (the "NY County Action"). The suit was filed on December 14, 2017 (Pl. Decl., Ex. M), but discontinued in July 2018 (*see* NY County Action, Dkt. #68; *see also* Pl. Decl., Ex. P). As relevant to the instant motion, Plaintiff received a referral to the Law Firm of Dayrel Sewell, PLLC ("Sewell") from a contact at Fordham Law School — where Plaintiff was then a student — for representation in the NY County Action, and Plaintiff ultimately retained Sewell for that purpose. (*See* Pl. Decl., Ex. G).[2]

---

[2]    References to Dayrel Sewell throughout the record utilize several spellings. Court filings from the NY County Action confirm that the proper spelling is "Dayrel Sewell" and the Court uses that spelling throughout this Opinion for consistency.

During the pendency of the NY County Action, Sewell filed an order to show cause against Plaintiff seeking unpaid attorneys' fees, which motion was denied. (*See* NY County Action, Dkt. #62; *see also* Pl. Decl. ¶ 25; Pl. Dep. 133:23-134:20).

On September 19, 2018, approximately three months before initiating the instant action, Plaintiff filed a *pro se* lawsuit against Sewell, Fordham University and associated individuals (collectively, "Fordham"), and an entity called the Schutzer Group, PLLC, in New York State Supreme Court, Bronx County, captioned [*John Doe 1*] v. *Law Firm of Dayrel Sewell, PLLC*, Index No. 300163/2018 (N.Y. Sup. Ct. Bronx Cnty.) (the "Bronx Action"). (*See generally* Bronx Action, Dkt. #1 (the "Bronx Action Complaint" or "Bronx Action Compl.")). In it, Plaintiff alleged that these defendants had schemed to induce Plaintiff to retain Sewell to defend him in the NY County Action, and then over-charged Plaintiff for legal services. (*See generally id.*).

As relevant to the instant motion, Plaintiff sought to recover extensive emotional distress damages in the Bronx Action that were strikingly similar to those sought in this case. (*See, e.g.*, Bronx Action Compl. ¶¶ 450, 457, 471-507, Ex. J, K). Of note, Plaintiff's complaint in the Bronx Action alleged that Plaintiff's emotional health had in fact improved significantly from the time he left the Club, but that because of his dealings with Sewell, Fordham, and the other Bronx Action defendants, any progress he had made in overcoming emotional distress had eroded away. (*Id.*). In point of fact, specifically as a

result of the conduct of the Bronx Action defendants, Plaintiff had tripled his

medication and suffered a nervous breakdown:

> [T]he stress endured by [Plaintiff] because of [the Bronx Action defendants'] malicious actions resulted in the following impact on Plaintiff['s] physical and mental health: [i] failure of Plaintiff['s] successful medical psychiatric treatment and of psychotherapy, [ii] resurgence of all of the following negative health symptoms that had been significantly reduced by psychotherapy and psychiatric treatment: depression, anxiety, panic attacks, nightmares, and insomnia, [iii] two-step increase of Plaintiff['s] dosage of antidepressants as a response to failure of his successful medical psychiatric treatment and of psychotherapy …, [iv] appearance and exacerbation of negative side effects currently suffered by [Plaintiff] … [and,] [v] beginning of Plaintiff['s] additional treatment to reduce the side effects caused by his medical psychiatric treatment.

(*Id.* ¶ 499 (internal citation omitted); *see also id.* at ¶¶ 72, 450, 457, 471-507,

Ex. J, K). In other words, in the Bronx Action, Plaintiff asseverated that he had

overcome the emotional distress caused by the conduct at issue in this case,

but that he suffered new and completely distinct emotional distress damages

as a result of the Bronx Action defendants' conduct in early 2018. (*See id.* at

¶¶ 72, 450, 457, 471-507; *see also id.* at ¶¶ 112-114).

## B.  Procedural History

Plaintiff initiated this suit on December 5, 2018 (Dkt. #1), and that same

day moved to proceed anonymously (Dkt. #3-4), which motion the Court

granted (Dkt. #8). Plaintiff sought "compensatory damages, punitive damages,

statutory damages, lost wages, back pay, front pay, attorney's fees, costs,

interest[,] and all other damages as are just and proper to remedy Defendants'

unlawful employment practices." (FAC at 16). Plaintiff later specified that he sought $214,466 in economic damages, $3,000,000 in emotional distress damages, and $6,000,000 in punitive damages. (*See* Shanahan Decl., Ex. C, D).

Defendants filed an answer, which included counterclaims arising out of Doe 2's arrest, on January 8, 2019. (*See* Dkt. #16). On January 11, 2019, the Court granted the parties' request that the named individual defendants be permitted to proceed anonymously. (Dkt. #21). That same day, the parties were automatically referred to mediation. (Dkt. #20). On January 17, 2019, Plaintiff filed an anonymized amended complaint (Dkt. #22-23), and on January 22, 2019, Defendants filed an anonymized amended answer with counterclaims (Dkt. #25).

Plaintiff filed a pre-motion letter seeking to dismiss Defendants' counterclaims on January 22, 2019 (Dkt. #26), and thereafter, Defendants voluntarily withdrew their counterclaims, conceding that the counterclaims were time-barred but otherwise disputing the factual allegations in Plaintiff's pre-motion letter (Dkt. #29; *see also* Mar. 19, 2019 Hr'g Tr. 19:2-11 (Dkt. #36)). On March 14, 2019, the Court was informed that mediation had been unsuccessful. (Dkt. #33). The Court subsequently held an initial pretrial conference with the parties on March 19, 2019. (*See generally* Mar. 19, 2019 Hr'g Tr.). At the initial conference, Defendants conceded that pre-trial motion practice would not resolve the factual issues at the heart of Plaintiff's case and therefore agreed with the Court that the case should proceed to trial (rather

than motion practice) after the close of discovery. (*Id.* at 21:18-22:3). Later that day, the Court issued a civil case management plan and scheduling order (Dkt. #35), and the parties proceeded to discovery. Pursuant to the scheduling order, the parties were to complete fact discovery by July 17, 2019, and expert discovery by August 31, 2019. (*Id.*).

### 1. The Discovery Disputes

Over the course of the next year, the parties acrimoniously litigated numerous discovery disputes. Each of Defendants' motions to compel yielded additional relevant material that should have been disclosed earlier; over time, these motions revealed a systematic campaign of obstruction by Plaintiff and his now-former counsel. Indeed, it would take several rounds of motion practice, Plaintiff's deposition, and the revelation of previously undisclosed litigation to uncover the full scope of this misconduct. The procedural history in this case is complex and the docket includes extensive submissions that are not germane to the resolution of the instant motion. Accordingly, the Court relates only the procedural history relevant to resolving Defendants' pending motion for sanctions.

### a. Initial Discovery Requests and Responses

On February 22, 2019, Plaintiff served his initial disclosures pursuant to Rule 26(a) of the Federal Rules of Civil Procure. (Shanahan Decl., Ex. B). As relevant here, Plaintiff disclosed nine non-party witnesses: three fact witnesses, Plaintiff's life partner, and five mental health care providers (the "Initial Providers"). (*Id.*). The Initial Providers purportedly furnished mental health

care to Plaintiff and could "speak to Plaintiff's severe emotional distress." (*Id.*).

Although not disclosed to Defendants until September 2019, Plaintiff's expert

on psychological and emotional distress damages, Dr. Yaakov Siegel, issued an

expert report concerning Plaintiff's mental health issues on March 6, 2019.

(*See* Def. Trial Ex. J (the "Siegel Report")).[3]

On April 5, 2019, Defendants served document demands and

interrogatories on Plaintiff.  In their first set of interrogatories, Defendants

sought, *inter alia*: "[t]he name, address[,] and contact information for all

individuals and/or entities that provided medical care or services to the

Plaintiff for [the] period of 2009 to the present" (Interrogatory 4), and "[t]he

names and contact information of all individuals and/or entities that Plaintiff

has sued or otherwise filed a complaint against for the period January 1, 2016

to present" (Interrogatory 10).  (Cohen Decl., Ex. 18).  On April 25, 2019,

Plaintiff emailed Mr. Cohen with responses to Defendants' interrogatories, and

in response to Interrogatory 4 disclosed only the Initial Providers.  (Pl. Decl.,

---

[3]     Plaintiff filed an amended Rule 26(a) disclosure on September 30, 2019, that included
        Dr. Siegel.  (Shanahan Decl., Ex. D).

Ex. B).[4]  In response to Interrogatory 10, Plaintiff disclosed no information to his counsel and instructed Mr. Cohen to object on relevance grounds.  (*Id.*).[5]

Plaintiff's formal interrogatory responses were served on May 2, 2019. (Cohen Decl., Ex. 18).  Plaintiff objected to Interrogatory 10 on relevance grounds (*id.*), and Defendants did not move to compel a further response. Plaintiff also objected to Interrogatory 4 on relevance and proportionality grounds, and limited his response "to the time period from July 2015 through April 2017." (*Id.*).  Subject to these objections and limitations, Plaintiff's interrogatory response disclosed only the Initial Providers.  (*Id.*).  Defendants had no reason to know that Plaintiff's response to Interrogatory 4 was incomplete and/or misleading, and therefore did not move to compel a further response to Interrogatory 4.

---

[4]     In an email dated May 22, 2019, Plaintiff told Mr. Cohen that Plaintiff's initial response to Interrogatory 4 only "provided information partially," and suggested that "we may add that [Plaintiff's] immigration case contains information about relevant medical institutions, including in Russia." (Pl. Decl., Ex. T).  On May 28, Plaintiff emailed Mr. Cohen a list of additional medical providers, including those later uncovered at Plaintiff's deposition and through his asylum application.  (*Id.*).  Among the medical care providers disclosed by Plaintiff to Mr. Cohen in these subsequent emails, but not disclosed to Defendants in response to Interrogatory 4, were Plaintiff's primary care physician, providers who furnished mental health services to Plaintiff, providers disclosed in Plaintiff's asylum application, and providers who consulted with Plaintiff prior to his submission of a workers' compensation claim.  (*Id.*).  Mr. Cohen ultimately opted not to include this information in Plaintiff's interrogatory responses.  (*See* Cohen Decl., Ex. 18).

[5]     By email to Plaintiff dated May 22, 2019, Mr. Cohen requested that, "[f]or any litigation outside of East Side Club (i.e. against your previous attorney for fees), please forward documents — complaint, answer." (Pl. Decl., Ex. R).  Plaintiff sent over the case number and name of the Bronx Action, but did not provide any documents.  (*Id.*).  Plaintiff also did not disclose any information about the NY County Action, a workers' compensation claim filed against another former employer in New York, or complaints filed against former employers in Russia.  (*Id.*; *see also* Pl. Decl., Ex. B (objecting to disclosure of any information in response to Interrogatory 10 on relevance grounds)).

In their first set of document demands, as relevant to instant motion, Defendants requested:

> 51.　Any and all documents contained in Plaintiff's political asylum application filed with the United States Government.

> 52.　Any and all documents drafted by or executed by Plaintiff in any legal proceeding in which the Plaintiff has been a litigant for the period 2016 to the present.

> 53.　Any and all documents filed in support of Plaintiff's application to be admitted as an attorney to practice before the bar of the State of New York or any other state in the United States.

(Dkt. #38-2). Plaintiff objected to the request for his political asylum application on relevance grounds, and objected to the other two requests on relevance, privilege, and proportionality grounds. (*See* Shanahan Decl., Ex. E; *see also* Dkt. #39). On May 16, 2019, Defendants moved to compel production of Plaintiff's asylum and bar applications, noting that both documents were directly relevant to Plaintiff's request for emotional damages. (Dkt. #38). Specifically, Defendants stated that a review of medical records provided by the Initial Providers revealed that Plaintiff had not discussed his reasons for seeking asylum, and that Plaintiff's answers to questions on the asylum application would clearly be relevant to Plaintiff's mental health and claimed emotional distress damages. (*Id.*).[6] As for the bar application, Defendants

---

[6]　For example, questions on the asylum application include: "[h]ave you … ever experienced harm or mistreatment or threats in the past by anyone"; "[d]o you fear harm or mistreatment if you return to your home country"; and "[h]ave you … ever been accused, charged, arrested, detained, interrogated, convicted and sentenced, or imprisoned[?]" (Dkt. #38-5).

theorized that it would provide information about Plaintiff's employment history, pending litigation and judgments, interactions with law enforcement, and mental health — all of which would be relevant to Plaintiff's claimed economic and emotional distress damages, as well as to his credibility. (*Id*.).[7]

On May 21, 2019, the Court overruled Plaintiff's objections and ordered Plaintiff to produce the documents under seal and for attorneys' eyes only. (Dkt. #40). However, due to the delay occasioned by the motion to compel, the parties were unable to complete fact discovery on time. (*See* Dkt. #41-42). The Court granted the parties' request for an extension of fact discovery. (Dkt. #43). Plaintiff produced the asylum application on or about June 20, 2019, but did not produce his bar application because Plaintiff had not at that time applied to the bar. (*See* Pl. Decl., Ex. T; *see also* Dkt. #42). Thereafter, the Court endorsed a revised case management plan and scheduling order, pursuant to which fact discovery was to close on September 30, 2019, and expert discovery on October 31, 2019. (Dkt. #45).

### b. Plaintiff's Asylum Application

Plaintiff's asylum application contained references to numerous medical providers that Plaintiff had failed to disclose in his Rule 26 disclosures and for which he had never provided HIPAA releases. (*See* Dkt. #46). The application also included sworn statements made by Plaintiff regarding the extensive

---

[7]     Defendants did not move to compel with respect to their request for documents related to Plaintiff's litigation history. However, Defendants' motion to compel production of Plaintiff's bar application explicitly highlighted that disclosure of the bar application would include "pending litigation and judgments," "interactions with law enforcement," and "disclosure of civil litigation." (Dkt. #38).

trauma, discrimination, and emotional distress that Plaintiff had experienced in Russia as a result of his sexual orientation, medical conditions, and political activism. (Dkt. #48-1). However, as Defendants noted, this information was completely absent from the medical records provided by the Initial Providers, who were represented by Plaintiff to be his exclusive mental health care providers. (Def. Br. 4-5). Furthermore, review of the application not only established that the information contained in it was clearly relevant to Plaintiff's emotional distress claims (*see* Dkt. #48-1), but also suggested that Plaintiff's arguments in opposition to Defendants' motion to compel its production had been grossly misleading.

Shortly after receiving Plaintiff's asylum application and after recognizing that Plaintiff and his counsel had failed to disclose medical care providers directly responsive to their initial discovery requests, Defendants moved to compel the disclosure of *all* providers who furnished medical care to Plaintiff from 2014 to the present, and sought HIPAA releases as to each medical provider not previously disclosed. (Dkt. #46). Plaintiff refused, arguing that Defendants failed to show how evidence related to Plaintiff's "physical ailments" was relevant to emotional distress damages. (Dkt. #47). Plaintiff did not, however, raise any grounds for objecting to the disclosure of previously undisclosed mental health service providers. (*Id.*). Worse yet, Plaintiff's counsel misrepresented the contents of Plaintiff's asylum application, in which Plaintiff had explicitly argued that his chronic medical conditions caused him great emotional distress and subjected him to discrimination and abuse in

Russia.  (Dkt. #48).  The Court ordered the parties to appear for a conference to resolve the motion to compel.  (Dkt. #49).

At the conference, Defendants explained that medical records from these previously undisclosed providers were relevant to Plaintiff's claim for damages for, *inter alia*, "aggravation, activation, and/or exacerbation of any pre-existing condition." (Aug. 6, 2019 Hr'g Tr. 12:14-15 (Dkt. #58) (quoting FAC ¶ 53)). Defense counsel argued that Plaintiff's conduct evinced an effort to conceal unfavorable facts despite their relevance to Plaintiff's claims for damages.  (*Id.* at 14:15-15:6).  In opposition, Mr. Cohen reiterated Plaintiff's argument that the previously undisclosed medical providers and medical records were irrelevant and would authorize a fishing expedition into Plaintiff's medical history.  (*Id.* at 17:15-18:19).  The Court granted Defendants' motion to compel, explaining that Plaintiff's conditions "are tied sufficiently to the emotional distress claims that [Plaintiff] is making in this litigation, including at paragraph 53 of the first amended complaint, that ... it is warranted that they be produced." (*Id.* at 19:11-14).  In so doing, the Court explicitly found that the records were relevant to Plaintiff's claims for emotional distress and the exacerbation of existing conditions.  (*Id.* at 18:23-19:14).

On August 28, 2019, Defendants were forced to file yet another motion to compel because Plaintiff had still not produced the HIPAA releases that were the subject of the August 6, 2019 conference.  (*See* Dkt. #55).  Defendants also sought an order compelling Plaintiff to cover the expenses incurred in pursuing the motion to compel and in serving expedited subpoenas as sanctions for

Plaintiff's continued failure to comply with the Court's discovery orders. (*Id.*). The same day, the Court granted Defendants' motion in part and ordered Plaintiff to produce the releases the following day. (Dkt. #59).[8]

### c.    Plaintiff's Deposition and Subsequent Discovery

Due to the delays occasioned by the aforementioned discovery disputes, Defendants did not depose Plaintiff until September 23, 2019. Although Plaintiff's counsel disclosed the Siegel Report on the eve of the deposition, counsel did not disclose treatment notes and other materials upon which the report was based. (*See* Shanahan Decl., Ex. J, K).

At his deposition, Plaintiff revealed still more medical care providers that had not been previously disclosed in response to Defendants' Interrogatory 4, in Plaintiff's Rule 26(a) disclosures, or in response to the Court's August 6, 2019 Order, even though Plaintiff testified that he furnished information about these providers to his counsel at DSLG. (Pl. Dep. 116:17-119:4; *see also* Pl. Decl., Ex. T (disclosing this information to DSLG in May 2019)). Plaintiff also disclosed for the first time that he had been supporting himself almost entirely with funds obtained from his life partner since he stopped working at the Club. (Pl. Dep. 112:2-113:25).

Additionally, Plaintiff provided new information concerning his mitigation efforts. Plaintiff had previously disclosed that he worked at a Trader Joe's store

---

[8]    After receiving the executed HIPAA releases, Defendants renewed their request for sanctions (Dkt. #61-62), which request the Court denied due in part to Defendants' failure to meet and confer with Mr. Cohen in advance of moving for sanctions (Dkt. #65). The Court also noted that the record then before it did not support an award of costs and attorneys' fees. (*Id.*).

from approximately April to June 2017 (*see* Cohen Decl., Ex. 18), but at his deposition, Plaintiff disclosed for the first time a workers' compensation action alleging that he had developed carpal tunnel syndrome while working at the store (Pl. Dep. 121:5-122:10).  Plaintiff further testified that due to his carpal tunnel syndrome, his "ability to look for a job was limited."  (*Id.* at 114:25-115:11; *see also id.* at 125:17-21).  Plaintiff explained that "because of [the] physical specifics of [his] body, [he] wasn't able to substitute [employment at the Club] with something else.  However, [he] could keep working at the East Side Club because this type of job doesn't have repetitive motion which did not affect [his] carpal tunnel."  (*Id.* at 140:11-16).

At his deposition, Plaintiff volunteered limited information about the Bronx Action.  (*See* Pl. Dep. 130:12-136:13, 250:8-251:22).  Plaintiff testified that he initiated the Bronx Action against Sewell alleging fraud arising out of a debt he owed Sewell, and that he was in the process of appealing the dismissal of his suit against Sewell to the Appellate Division, First Department.  (*Id.* at 131:18-136:13).  Plaintiff testified that he owed Sewell approximately $70,000, arising out of Sewell's representation of him in the NY County Action.  (*Id.* at 133:15-134:20).  However, Plaintiff failed to clarify that the Bronx Action and its appeal also involved a number of claims against Fordham and the Schutzer Group, or that it sought to recover extensive emotional distress damages similar to those sought in this case.  (*See* Bronx Action Compl. ¶¶ 450, 457, 471-507, Ex. J, K).

Later in the deposition, Plaintiff again failed to disclose his claims against Fordham and again withheld material information about the emotional distress damages sought in the Bronx Action:

> Q. You sued your ex-lawyer for fraud. Right? [...]
>
> A. I'm suing my ex-lawyer for fraud.
>
> Q. I'm trying to keep all the actions you have going on.
>
> A. Only this and that, two.
>
> Q. It's just two right now?
>
> A. It[']s two in my life.

(Pl. Dep. 272:7-17; *see also id.* at 175:8-15). Plaintiff further opined that defense counsel's questions regarding his other litigation were irrelevant and inadmissible as character evidence, and instructed defense counsel to "move on with [his] questions[.]" (*Id.* at 177:10-17).

Separately, Plaintiff was questioned about his claimed psychiatric problems and the connections between those problems and his employment at the Club. To begin, Plaintiff unequivocally testified that he had not suffered from psychiatric problems prior to his employment at the Club:

> Q. So given there is no reference to Downtown Psychiatric [an Initial Provider] in [Dr. Siegel's] report, I again go back to that sentence — "[Plaintiff] reported no history of psychiatric problems, explaining he was always able to deal with the stressors of life prior to discrimination and sexual assault." So that's not an accurate statement, is it? [...]
>
> A. This is an accurate statement.
>
> Q. This is an accurate statement?
>
> A. Yes.

(Pl. Dep. 203:10-23). Plaintiff issued a similar denial a few minutes later:

> Q. [Y]ou represented to Dr. Siegel that this was — this being after working at the East Side Club was the first time that you struggled with anxiety and depression. Isn't it true you suffered from anxiety and depression since moving to the United States or coming to the United States in 2014?
>
> A. No, it's not true.

(*Id.* at 207:14-22; *see also id.* at 198:17-199:24). Critically to the instant motion, Plaintiff disclaimed suffering *any* emotional damage as a result of his interactions with or lawsuit against Sewell (*id.* at 324:15-325:15), and testified that there were no other factors that contributed to his emotional distress:

> Q. So my question to you is, are there other factors contributing to the alleged emotional distress that you claim to be suffering from? [...]
>
> A. The answer is no.

(*Id.* at 326:12-17).

Plaintiff also testified about his 2019 consultation with expert witness Yaakov Siegel. He testified that he met with Dr. Siegel for roughly one-and-a-half to two hours. (Pl. Dep. 142:11-17). According to Plaintiff, they discussed, *inter alia*, Plaintiff's psychiatric history, including his brief stay at a psychiatric hospital in Russia, his asylum application, mental health treatment provided by the Initial Providers, medical care obtained from providers revealed as a result of Defendants' prior motions to compel, and the fact that Plaintiff's life partner had financially supported him since the termination of his employment at the Club. (*Id.* at 198:24-212:11, 249:13-21).

Following Plaintiff's deposition, and despite the close of fact discovery on September 30, 2019 (*see* Dkt. #45), Defendants sought to continue discovery, citing the raft of information disclosed for the first time at Plaintiff's deposition (Shanahan Decl., Ex. M).[9] Plaintiff did not initially respond to Defendants' requests, but at a status conference on October 15, 2019, objected to same on timeliness grounds. (*See* Oct. 15, 2019 Hr'g Tr. 8:17-9:16 (Shanahan Decl., Ex. P)). The Court overruled Plaintiff's objection, explaining that Defendants could not be penalized for seeking discovery after the close of fact discovery when Defendants were not aware that such discovery existed precisely because Plaintiff and/or his counsel had failed to disclose it. (*Id.* at 8:17-24). The Court extended the expert discovery deadline and ordered Plaintiff to produce the HIPAA releases, certain material related to the Siegel Report, and other documents sought as a result of new information disclosed in Plaintiff's deposition. (*Id.* at 9:19-10:21, 11:6-14, 17:19-18:6).

Plaintiff also objected to Defendants' request for documents relating to mitigation of damages, arguing that Defendants should have requested this information earlier. (Oct. 15, 2019 Hr'g Tr. 12:1-5, 13:18-14:3). Here, too, Defendants explained that they had requested information regarding mitigation

---

[9] For example, at his deposition, Plaintiff disclosed several additional medical providers and his workers' compensation claim for the first time, necessitating further requests for production, requests for HIPAA authorizations, and subpoenas. Plaintiff also testified that he had told Dr. Siegel about his mental health, medical, and employment history (*see* Pl. Dep. 198:24-212:11, 249:13-21), and as such Defendants sought discovery as to the records and notes Dr. Siegel used to prepare his expert report, which information was not included in Plaintiff's September 19, 2019 production of the report. (*See generally* Siegel Report; *see also* Shanahan Decl., Ex. K, M). Additionally, Defendants sought documentation of the $70,000 in loans that Plaintiff had received from his life partner since leaving the Club. (*See* Pl. Dep. 113:23-114:8).

previously, that such information had not been produced, and that these specific requests were directly related to information disclosed by Plaintiff for the first time at his deposition. (*Id.* at 12:11-13:8; *see also id.* at 14:6-10). The Court overruled Plaintiff's objections to this request for the same reasons it overruled his objections to producing previously undisclosed material. (*See id.* at 13:9-12, 14:11-16, 17:19-18:6).

Thereafter, on October 29, 2019, Dr. Siegel issued an addendum to his report stating that his "office requested [Plaintiff's] medical records from the Derek Smith Law Group but received none." (Shanahan Reply Decl., Ex. AA). Additionally, among the discovery produced in response to this motion to compel were records demonstrating that Plaintiff had abandoned his workers' compensation claim after, *inter alia*, being told by a New York State investigator that he "could not develop the carpal tunnel syndrome in just 1 month of employment." (Def. Trial Ex. S). By email dated November 15, 2019, just weeks after the Court ordered the New York State Workers' Compensation Board to produce Plaintiff's file (*see* Dkt. #69), Plaintiff withdrew his claim for economic damages, leaving only his emotional distress claims (Dkt. #73-12; *see also* Nov. 26, 2019 Hr'g Tr. 22:21-24:17 (Dkt. #77)).[10]

### d.    The Expert Deposition

On November 18, 2019, Defendants filed a pre-motion letter notifying the Court of a dispute over the fees that Dr. Siegel sought to charge Defendants for

---

[10]    Plaintiff also continued to seek damages for ancillary issues, such as attorneys' fees, interest, and punitive damages. (Nov. 26, 2019 Hr'g Tr. 22:21-24:17 (Dkt. #77)).

his deposition and for the preparation of an updated list of cases for which he had been retained by DSLG as an expert. (Dkt. #73). Defendants also sought sanctions, arguing that: (i) Plaintiff's position on Dr. Siegel's fees was unreasonable in light of prior litigation over this identical issue; (ii) Dr. Siegel had been retained as an expert by DSLG in more than 140 cases over the previous three years; and (iii) DSLG and Dr. Siegel were engaging in an improper scheme whereby DSLG hired Dr. Siegel to write favorable reports on behalf of its plaintiffs with scant information or investigation in order to force a favorable settlement. (*Id.*). Plaintiff's counsel countered that it did not exercise control over Dr. Siegel or his fees, and disputed Defendants' characterization of its relationship with Dr. Siegel. (Dkt. #74).

The Court addressed this disagreement at a November 26, 2019 conference, and ordered that Defendants pay a reduced flat fee for deposition preparation, the deposition, travel, and an updated case list. (Nov. 26, 2019 Hr'g Tr. 29:13-21). The Court denied the motion for sanctions after determining that — on the record then before it — DSLG did not exercise "actual control" over Dr. Siegel. (*Id.* at 30:12-13). But the Court nevertheless expressed concern with several elements of DSLG's relationship with Dr. Siegel:

> THE COURT: … I think it is quite troubling to me, and I mentioned and I began this conference by speaking of Dr. Siegel'[s] practices as something of a loss leader where he has a plaintiff whom he can charge a modest fee towards and then make up the fees on the back end by charging or overcharging, as the case may be, a lot of extra money to the defendants who will necessarily want to be taking his deposition.

(*Id.* at 30:1-8). The Court also expressed skepticism as to Dr. Siegel's methodology in this specific case:

> THE COURT: I guess at some point, if I ever have the pleasure of meeting Dr. Siegel, I will question him at long length about how much time it takes him to put together a[n expert] report because … I think I would be concerned if he only spent two hours, soup to nuts, with your client coming up with this report in which he is making very, very serious statements about the mental and emotional health of your client. But, I suppose I will leave that for someone else's deposition or cross-examination.

(*Id.* at 11:8-16). With these issues resolved, the parties proceeded to the deposition of Dr. Siegel.

Defendants deposed Dr. Siegel on December 5, 2019. (*See generally* Siegel Dep.). As relevant to the instant motion, Dr. Siegel testified that in preparing his expert report, he had not reviewed any of Plaintiff's medical or mental health records, nor had he spoken with any collateral sources. (*Id.* at 28:21-23, 43:8-19; *see also id.* at 72:12-84:10 (denying that he reviewed records from each mental health and medical care provider disclosed to Defendants at the time of the deposition)). Dr. Siegel testified that his office requested "any psychiatric records of prior treatment or any records of chronic or [non-]chronic illness that might affect the patient's mood and functioning or major medical events that might have contributed to the Plaintiff's emotional functioning," from DSLG in advance of his evaluation of Plaintiff. (*Id.* at 18:4-15). However, Dr. Siegel said he never received any material from DSLG, and that he was told by DSLG that the reason why he was not provided with such records was because they "don't have any." (*Id.* at 47:15-48:2).

Nor was Dr. Siegel informed generally about Plaintiff's medical history, mental health history, or asylum application, beyond what Plaintiff self-reported at Dr. Siegel's two-hour evaluation. (Siegel Dep. 81:11-20, 98:8-101:9). For example, Dr. Siegel was not informed that Plaintiff had been sent for psychiatric evaluation as a result of a purported suicide attempt in Russia. (*Id.* at 96:8-97:8).[11] Nor was Dr. Siegel told about any of Plaintiff's medical history or history of mental health treatment, besides the fact that Plaintiff was generally receiving therapy and medication (*id.* at 98:8-101:9; *see also* 72:12-81:10), though Dr. Siegel considered it "entirely plausible" that he may have been aware of the existence of one of the Initial Providers (*id.* at 100:25-101:9). Importantly, Dr. Siegel testified that Plaintiff told him he was not involved in any other litigation:

> Q. Did Plaintiff disclose to you that he was being sued by his then attorney or ex-attorney?
>
> A. Oh, no. … And, specifically, where it says "legal, none", this is shorthand. These are my internal notes.
>
> Q. Right.
>
> A. The question that I asked him was: "Please tell me any legal history that you have, including arrests and lawsuits." And he said "none" or "I don't have any" and that is what that reflects.
>
> Q. He didn't mention to you that he was a Defendant in a breach of contract action commenced against him by his former attorney?

---

[11] Plaintiff disputes that he attempted to commit suicide. (Pl. Opp. 3-4). However, Dr. Siegel testified that such information would be relevant to his evaluation even if Plaintiff disputed the characterization of those events. (*See* Siegel Dep. 96:8-97:8).

> A.  Correct.
>
> Q.  And he didn't mention to you that he was a Plaintiff in a fraud action that he then commenced against his former attorney?
>
> A.  Correct.
>
> * * *
>
> Q.  If he is a Plaintiff in a ... litigation against his former Counsel, would you have expected him to disclose that to you? [...]
>
> A.  Yes.  I asked him directly.  That was the question.  I was looking for him to disclose to me any legal proceeding that he has been or is involved in.  I wanted to know that information.  And I would have expected him to have told me that.

(*Id.* at 58:6-59:20; *see also id.* at 73:17-75:17 (denying any knowledge of Plaintiff's criminal complaint against Doe 2); *id.* at 105:6-106:18 (refuting Plaintiff's deposition testimony that Plaintiff disclosed to him the Bronx Action)).  Dr. Siegel also testified that Plaintiff did not disclose his workers' compensation claim against Trader Joe's, the complaints he filed against other former employers, or his claimed carpal tunnel syndrome.  (*Id.* at 61:2-62:12, 91:22-92:3).

Dr. Siegel concluded his deposition, in response to a question as to whether Plaintiff was fabricating or exaggerating his purported psychological damage, by stating:

> A:  [A]t the time that I wrote my report, I concluded that [Plaintiff] was not malingering and ... that my opinion was valid and reliable.  Today, you presented to me some information that suggests that he might not have disclosed to me everything that he could have.  I would

> have to consider that and take it under advisement, whether that changes my opinion or not.

(Siegel Dep. 142:18-143:3). As Dr. Siegel testified, he was never told of the existence of — or provided medical records from — any of the Initial Providers or from any of the other mental health or medical care providers disclosed as a result of Defendants' motions to compel. (*See id.* at 98:8-101:9). Nor was Dr. Siegel told about any of the specific information in Plaintiff's asylum application, though he testified that Plaintiff told him generally about discrimination he had experienced in Russia. (*See id.* at 56:19-57:20, 81:11-20).

### 2. The Pretrial Revelations

On October 16, 2019, the Court set a trial date of February 24, 2020 (Dkt. #67), which date was adjourned to March 2, 2020, to allow Plaintiff to sit for the New York State bar examination in late February (*see* Dkt. #68, 70). The parties submitted pretrial motions, including motions *in limine*, on January 13, 2020 (Dkt. #83-88), and filed their oppositions on January 20, 2020 (Dkt. #89-90). According to the parties' Joint Pretrial Order, Plaintiff sought $6,000,000 in emotional distress damages and $9,000,000 in punitive damages at trial. (Dkt. #85 at 18).

Plaintiff filed seventeen motions *in limine* (Dkt. #86), while Defendants filed three (Dkt. #84, 91). Of relevance to the instant motion is Plaintiff's tenth motion *in limine* — seeking to exclude evidence regarding Plaintiff's other litigation — in which motion Plaintiff's counsel described the Bronx Action as "a fee dispute between Plaintiff and his attorney in another case." (Dkt. #86).

The parties' motions *in limine* were resolved in part at a conference held on January 30, 2020.  (*See generally* Jan. 30, 2020 Hr'g Tr. (Dkt. #101)).  However, after discussing the issues raised by Plaintiff's other litigation and their relevance *vel non* to the instant case, the Court reserved judgment on the tenth motion *in limine*.  (*Id.* at 36:21-24).

On February 14, 2020, Plaintiff's counsel wrote to the Court seeking a modification to the trial schedule to end the trial day several hours early on March 3, 2020, with the stated purpose of allowing Plaintiff to "argue before the Appellate Division in another matter (Appellate Division (First Department) 2019-1059 ([John Doe 1] v Law Firm of Dayrel Sewell, PLLC, et al)."  (Dkt. #93).  As with Plaintiff's deposition testimony regarding the Bronx Action and appeal, the February 14 letter did not mention that Plaintiff had sued Fordham and other parties, or that Plaintiff had sought emotional distress damages in the Bronx Action that conflicted with the damages sought in the instant litigation; in so doing, counsel perpetuated the misrepresentation that the Bronx Action was simply a dispute over attorneys' fees.  (*See id.*).  Nor did the letter specify that the appeal to be argued on March 3, 2020, was against the Fordham defendants, and not against the Sewell defendants, as was to be revealed later.  (*See* Dkt. #98; *see generally* Feb. 28, 2020 Hr'g Tr. (Dkt. #108)).  The Court granted the schedule modification on February 18, 2020.  (Dkt. #94).

On February 21, 2020, the parties attended a teleconference with the Court to address several of the outstanding motions *in limine* and other pretrial issues.  (*See generally* Feb. 21, 2020 Hr'g Tr. (Dkt. #114)).  At the conference,

the Court asked Plaintiff's counsel specific questions about the nature of the

Bronx Action:

> THE COURT: ... There's reference to a lawsuit or a dispute with a prior attorney by the name of Dayrel Sewell, and I was wondering ... was there, in fact, a lawsuit brought?
>
> * * *
>
> MS. SMITH: ... I believe, if I'm not mistaken, that the litigation is what plaintiff has scheduled for oral argument that we address in our letter brief to end proceedings early one day. Yes, litigation was brought, and it is still active litigation.

(*Id.* at 17:25-18:17). Later in the conference, the Court explicitly inquired

whether Plaintiff was engaged in litigation against Fordham or any other

parties, to which Plaintiff's counsel responded in the negative:

> THE COURT: ... But there is reference as well to a lawsuit against a professor at Fordham University. Maybe it was just an administrative proceeding, but there was something in plaintiff's proposed Exhibit 5 in the June or May 2018 records ... where there is a discussion about a dispute that the plaintiff is having with Fordham University ....
>
> I don't know if there's an actual lawsuit related to this or whether that was done administratively so I don't know that it matters at all. But I suppose my question to Ms. Smith and Mr. Cohen is, what lawsuits right now or in the very recent past has the plaintiff filed other than the ones we have been speaking about, this case and the case as to which there is an appeal upcoming? Is there anything else?
>
> MR. COHEN: No, your Honor. The one grade issue I don't believe was actually in fact a lawsuit. That may have been just been an internal school issue. *Other than the litigation that we just discussed, I don't believe there's any currently active.*

(*Id.* at 20:1-22 (emphasis added)). The following week — the week before trial was to commence — the parties attended another pretrial conference at which Plaintiff's counsel indicated that Plaintiff did not intend to call Dr. Siegel as a trial witness. (Feb. 25, 2020 Hr'g Tr. 12:5-13 (Dkt. #110)).

On February 26, 2020, Defendants filed a letter with the Court revealing, for the first time, Plaintiff's previously undisclosed litigation against Fordham, the Schutzer Group, and other associated individuals. (Dkt. #96). Specifically, Defendants explained that:

> After reviewing [recently produced mental health] treatment records for Plaintiff, [defense counsel] was confused regarding references to a potential "litigation" involving Fordham University. [At the February 21, 2020 conference, Plaintiff's counsel] confirmed that there was no litigation commenced against Fordham but rather Plaintiff had a dispute with a professor. This is not accurate at all. Given substantial questions were raised by references to Fordham in recently produced psychiatric records, [defense counsel] conducted due diligence yesterday and reviewed the file at the Appellate Division First Department.

(*Id.* (footnote omitted)). Defendants' review of the record at the First Department revealed that:

> [Plaintiff] failed to disclose that he had also sued Fordham University, a professor at Fordham University, and … the [Schutzer] Group, PLLC. In his appeal, he alleges two law firms, a number of lawyers, a professor at Fordham Law School and Fordham University are all working in collusion to defraud him as part of a civil conspiracy. Moreover, in his self-styled fraud action, [Plaintiff] seeks very substantial emotional distress damages, similar to this matter.

(*Id.* (emphasis and internal citations omitted)).

Defendants argued that the failure by Plaintiff or his counsel to disclose litigation against Fordham was part of a pattern of concealing unfavorable facts throughout the litigation, offering as a prior example the fact that "Plaintiff withheld critical information from Dr. Siegel and [Defendants' expert]." (Dkt. #96). Defendants sought leave to add newly-discovered court filings from the Bronx Action appeal to their potential trial exhibits, both because of the overlap in the emotional damages sought in the two cases and as evidence of Plaintiff's and his counsel's persistent practice of concealing unfavorable facts. (*Id.*).

The Court convened a conference the following day, February 27, 2020, to address the previously undisclosed litigation uncovered by Defendants. (Dkt. #97; *see generally* Feb. 27, 2020 Hr'g Tr. (Dkt. #106)). In a colloquy with Mr. Cohen, the Court explored the scope and limits of DSLG's knowledge of Plaintiff's other litigation:

> THE COURT: Mr. Cohen, have you read your client's complaint in that case in the Bronx Supreme Court?
>
> MR. COHEN: I have not, your Honor.
>
> THE COURT: Okay. I have. Separately, have you reviewed the materials, the briefs to the Appellate Division First Judicial Department in this case? Have you reviewed your client's appeal in this case sir?
>
> MR. COHEN: I have not had a chance to. I have a general understanding and idea of it but I have not been able to go through it in depth.
>
> THE COURT: Okay. I have. Have you reviewed the docket sheet for the underlying Bronx action, sir?
>
> MR. COHEN: I have not, your Honor.

THE COURT: I have done that too. Let me tell you a few things about this case that you either knew and did not tell me about on Friday, or should have known and told me about on Friday. Your client filed an approximately 200-page-complaint naming as defendants the law firm of Dayrel Sewell, an associate of Mr. Sewell's ..., an entity called the Schutzer Group, a gentleman named Rikin Desai, a gentleman named Anthony Agolia, and Fordham University. In that litigation, in case you are wondering, among other things, your client alleges ..., in substance and in part, that he was doing better with respect to any issues of emotional distress that he may have been feeling as a result of his employment experiences at the East Side Club, he was on the road to getting stable, but precisely, primarily, and perhaps exclusively, because of his dealings with Mr. Sewell, Fordham University, and the defendants in [the Bronx Action], those contacts eroded. All of the progress he had made required him to triple his medication, led to a nervous breakdown, and lead to continuing side effects as a consequence of the increased medication he is taking.

* * *

But, even today, in the very appeal that he is going to be arguing on Tuesday when he leaves my courtroom — assuming this case still exists by then — he is going to be arguing that it was inappropriate to dismiss the intentional infliction of emotional distress claims against [the Bronx Action defendants] because he believes that the fraudulent conduct in which they engaged contributed to or caused him emotional distress. Now, Mr. Cohen, I'm going to stop talking for a moment and you are going to tell me why none of that was called to my attention prior to my having to get the documents from the First Department in order to understand this. Please begin, sir.

MR. COHEN: Your Honor, I apologize. I mean, you know, obviously we have been focused on this case. I was aware of this other litigation involving a fee dispute between him and his attorney but ... I wasn't aware of the extent of it and, quite frankly, I didn't review the papers in that case. I knew generally what the matter

entailed and I didn't know exactly what [Plaintiff] was suing for, what claims he was suing for.

(Feb. 27, 2020 Hr'g Tr. 4:3-6:17).  The Court then asked Mr. Cohen to explain his misrepresentation to the Court at the February 21, 2020 conference:

> THE COURT:  I see.  But, sir, I asked you on Friday a specific question about Fordham University and you spoke falsely to me.  Why did you do that?  And why is it that I have to, in order to keep this case honest, why am I out there digging up dockets from other cases?  Why can't I trust that when I ask you a question about a litigation that you will answer me correctly and honestly about it[?]
>
> MR. COHEN:  Absolutely, your Honor.  And when I spoke to you on Friday I really had no idea that Fordham was a named party in this suit.  I just thought, you know, from speaking to my client, that there was a litigation between him and his former attorney.  I had no idea that Fordham was named, that Fordham was involved.

(*Id.* at 7:13-25).

At the February 27, 2020 conference, Mr. Cohen argued that his false statement to the Court regarding Plaintiff's litigation against Fordham was a good faith mistake because he had been simply unaware of Plaintiff's litigation against Fordham.  But Mr. Cohen also conceded that he had not conducted any due diligence into the issue, and had never reviewed the complaint, briefing, or any other documents from the Bronx Action and appeal (Feb. 27, 2020 Hr'g Tr. 4:3-17) — despite affirmatively representing to the Court in Plaintiff's tenth motion *in limine* that the Bronx Action was "irrelevant" and was solely "a fee dispute between Plaintiff and his attorney in another case" (*see*

Dkt. #86), and despite making a similar representation to the Court on this issue at the February 21, 2020 conference (*see* Feb. 21 Hr'g Tr. 20:1-22).

The Court next pressed Mr. Cohen on whether Plaintiff had perjured himself at his deposition, wherein Plaintiff testified that there were no other factors contributing to the alleged emotional distress from which Plaintiff claimed to be suffering (*see* Pl. Dep. 326:12-17):

> THE COURT: ... [E]ven now, in submissions that [Plaintiff] made in November of 2019 that I am staring at as I am talking to you, he is talking about why it is [that] the emotional distress claims that he filed in [the Bronx Action] are the cause of his emotional distress. ... [Plaintiff] makes the point in his complaint of separating them out and saying that it is the fight that he is having with Mr. Sewell and his law firm and the fraudulent manner in which they dealt with him that is causing him emotional distress. So, I guess I just don't understand how you could allow him to testify to that at his deposition when he was simultaneously bringing a lawsuit against other entities in which he was claiming emotional distress. ...
>
> * * *
>
> MR. COHEN: So ... [Plaintiff] does state that he is suffering to some extent regarding this lawsuit and, in addition to that, I mean I think the question isn't the most artful and Mr. Shanahan had the opportunity to follow up and really dig in and specify exactly what he is talking about but he doesn't. My client addressed the other litigation. He said that he was suffering from it somewhat, we don't like lawsuits, sure, is what he said, and the[n] Mr. Shanahan asks about the medical records and asks why he is discussing this other litigation in medical records and he is saying because it is what's going on with my life and outlining it like that. So, he does state that; he doesn't definitively say no, he is not suffering from this, he actually does. And Mr. Shanahan doesn't clarify the factors, yes.

> THE COURT: Mr. Cohen, I am really not sure why it is
> that you feel compelled to pawn off responsibility on
> everybody else in this case other than your client. ...
> But you have made this strange distinction in the
> questioning between emotional distress and emotional
> suffering but the point remains that when [] Mr.
> Shanahan asked whether the emotional distress that
> your client claims to be suffering, whether that was
> entirely attributed to the East Side Club and its
> employees or something else, when asked whether there
> was anything else to the emotional distress for which he
> is seeking large sums of money in this case, he says the
> answer is no. ... [P]erhaps there is later [testimony], but
> I don't know how he can say that when he has another
> lawsuit in which there is a claim for intentional
> infliction of emotional distress that he continues to
> maintain at the First Department.

(Feb. 27, 2020 Hr'g Tr. 8:17-11:4). In addition to arguing that the emotional

distress damages sought in the Bronx Action were completely distinct from

Plaintiff's $6,000,000 claim for emotional distress damages in this case (and

thus did not need to be disclosed), Mr. Cohen also sought to blame defense

counsel for failing to uncover the full scope of Plaintiff's other litigation. Mr.

Cohen argued that defense counsel failed to ask appropriate follow-up

questions at Plaintiff's deposition and failed to more fully investigate Plaintiff's

case against Sewell. (*See id.* at 6:24-7:7, 9:8-10:13).

In response to the Court's questions on this issue, defense counsel noted

that the Bronx Action had been repeatedly described by Plaintiff and his

attorneys as a dispute over attorneys' fees. (*See* Feb. 27, 2020 Hr'g Tr. 13:15-

14:1; *see also* Dkt. #86; Feb. 21, 2020 Hr'g Tr. 17:25-18:17; Pl. Dep. 130:15-

136:13, 250:8-251:22). Defense counsel also explained that when he tried to

investigate the First Department appeal after Plaintiff's deposition, he was

unable to view the information about the case online, due to the manner in which the New York Unified Court System docketed filings in cases with *pro se* litigants, and as such could only review limited information about the appeal. (Feb. 27, 2020 Hr'g Tr. 14:7-15:19). In consequence, defense counsel only learned of Fordham's involvement after he physically visited the First Department to view the filings made in the case. (*Id.* at 15:20-24).

Hoping to pivot from defense to offense, Mr. Cohen objected to the introduction at trial of information about Plaintiff's other litigation, citing the last-minute nature of the revelations about the scope of the Bronx Action. The Court disagreed:

> THE COURT: [Y]ou cannot at this stage in the game []
> say that it's too late for us to begin looking at these
> things because from where I am sitting these are things
> that you or your client hid from the defense and from
> the Court and I am very disturbed. ... [H]owever much
> you want to blame Mr. Shanahan for me not knowing
> about this information, I don't think that's especially
> fair.

(Feb. 27, 2020 Hr'g Tr. 25:14-26:3). At the close of the conference, Plaintiff confirmed that he would not call Dr. Siegel to testify at trial, and Defendants agreed not to call their expert as well. (*Id.* at 26:11-16).

The next day — the Friday before trial was to begin — Defendants filed a letter containing information discovered after still further investigation into the Bronx Action, namely "that Plaintiff has not one, but two appeals, currently pending in the First [D]epartment": the first against Fordham and related individuals and the second against Sewell and related defendants. (Dkt. #98). Although Plaintiff's letter requesting an adjustment of the trial schedule on

March 3, 2020, to allow Plaintiff to argue his appeal had noted that the appeal was against Sewell (*see* Dkt. #93), and although Plaintiff's counsel had subsequently confirmed that the March 3rd oral argument addressed claims against Sewell (Feb. 21, 2020 Hr'g Tr. 17:25-18:17), Defendants' letter revealed that the March 3rd argument in fact pertained to the Fordham defendants (Dkt. #98). Approximately one hour later, Plaintiff submitted a letter to the Court withdrawing his claim for emotional distress damages entirely, leaving only claims for nominal damages, punitive damages, attorneys' fees, and costs. (Dkt. #99). Plaintiff claimed this was done to "remove the need to inquire into Plaintiff's other litigation" and "to simplify the issues and focus on the facts of this case." (*Id.*). The Court convened another conference later that day to address the latest developments. (*See generally* Feb. 28, 2020 Hr'g Tr.).

At the conference, the Court confirmed, after its independent investigation of the docket of the Bronx Action and related appeals, that the following information was not accessible online: (i) filings from the Bronx Action and related appeals, and (ii) information about parties to the action other than Sewell. (Feb. 28, 2020 Hr'g Tr. 2:15-21). Indeed, this Court obtained information about the Bronx Action and related appeals only after speaking with the judge presiding over the Bronx Action. (*See id.* at 2:18-21). Thus, absent disclosure by Plaintiff and/or his counsel, it would have been extremely difficult, even had Defendants or the Court immediately investigated the Bronx Action, to determine that this oft-described "dispute over attorneys' fees" included parties other than Plaintiff's former counsel and sought extensive

emotional distress damages that overlapped significantly with the damages sought here.

The Court also confirmed that the appeal to be argued on March 3, 2020, concerned the Fordham defendants, not the Sewell defendants, revealing yet another misrepresentation by Plaintiff's counsel to the Court:

> THE COURT: Mr. Cohen, let me now turn to you, sir. I'm now even more confused than I was yesterday, or perhaps not, because I did find those documents I was reciting to you which referenced an appeal against what I will call the Sewell group of defendants but not the Fordham group. I had understood, because I understood that there was only one appeal, that the argument on next Tuesday was of that matter. I now understand that that argument is of the Fordham defendants. I'm not really enjoying this learning by accretion, so could you tell me, please, how this came about or what you knew and when you knew it?
>
> MR. COHEN: Sure, your Honor. And I apologize to the Court for any confusion that there may have been. As I stated, I think it was yesterday, I had no idea — I knew there was a dispute with his former attorney, and that's really kind of what I knew. I didn't think that it would be all of these 900-page complaint, 200-page complaint, I thought it was a fee dispute, and I was kind of focused on this case and pushed this case forward. I didn't know that there were two appeals. I didn't know that Fordham was a named party, I just assumed it was a dispute with his attorney and that was that. I didn't think there was an allegation of emotional distress. I didn't know.

(Feb. 28, 2020 Hr'g Tr. 3:3-25). In the same breath, however, Mr. Cohen faulted Defendants for not uncovering the undisclosed information about the Bronx Action earlier, arguing that "generally speaking, [defense counsel] was also aware of this dispute with my client and his former attorney. This wasn't anything like hiding the ball." (*Id.* at 4:1-9). The Court disagreed with Mr.

Cohen's characterization of the situation, stating that "[g]iven the deposition of your client, which I reread, I don't think it's fair to assume that Mr. Shanahan could have known about the Fordham matter." (*Id.* at 5:9-11; *see also id.* at 5:11-18). Defense counsel underscored that he had only discovered the misrepresentations by Plaintiff and his counsel here because of similarities between this case and DSLG's conduct in another case in which defense counsel participated. (*Id.* at 12:24-13:15).

After the Court turned to Plaintiff's request to abandon his claim for emotional distress damages, Plaintiff's counsel disclosed that they sought not just to withdraw Plaintiff's claim for emotional distress damages, but to have the Court dismiss the case in its entirety:

> MS. SMITH: … Now having reviewed everything and as the discovery is coming to light, I have counseled the client that I believe it is in his best interest [that] we move the Court to dismiss the entire case and do not seek to move forward to a jury trial. … We do not believe this was brought frivolously or that … the plaintiff[] misrepresented anything, but in how the discovery came out, some of the issues that have arisen in the last few days, again I have counseled the client that I believe it is in his best interest to walk away from this.

(Feb. 28, 2020 Hr'g Tr. 6:6-18). Defendants joined in the request that Plaintiff's claims be dismissed, but sought leave to pursue the instant motion for sanctions against Plaintiff, Mr. Cohen, and DSLG. (*Id.* at 8:6-12, 11:25-12:23, 15:9-12). The Court then dismissed the case with prejudice, cancelled the jury trial, and granted Defendants leave to pursue the instant motion for sanctions. (*Id.* at 18:10-18).

### 3.     The Instant Motion

On March 3, 2020, the Court adopted the parties' proposed briefing schedule on Defendants' anticipated motion for sanctions.  (Dkt. #103).  On May 4, 2020, Defendants filed their motion for sanctions (Dkt. #116-120), including a 51-page memorandum of law, which was 26 pages in excess of the limit set by the Court's Individual Rules of Practice in Civil Cases (Dkt. #119).

On May 14, 2020, Plaintiff filed a pre-motion letter seeking permission to file a cross-motion for sanctions, arguing that Defendants' motion exceeded the page limit set by the Court's individual rules and that Defendants improperly sought to relitigate prior unsuccessful motions for sanctions.  (Dkt. #121).  Defendants filed a letter in opposition on May 17, 2020, and additionally moved for leave, *nunc pro tunc*, to have the Court accept the oversize memorandum of law.  (Dkt. #122).  On May 20, 2020, Plaintiff filed a letter in reply and opposition to Defendants' motion.  (Dkt. #123).  By Order dated May 22, 2020, the Court denied Plaintiff's request to pursue a cross-motion for sanctions, noting that the Court could award to the person who prevails on a motion under Rule 11 reasonable expenses, obviating the need for a cross-motion.  (Dkt. #124).  The Court also denied Defendants' application for the Court to accept their 51-page memorandum of law, ordered Defendants' motion for sanctions to be stricken from the docket, set a briefing schedule for a revised motion for sanctions, and granted Defendants leave to file a 35-page memorandum of law in support of their revised motion for sanctions.  (*Id.*).

Defendants filed their revised motion for sanctions and supporting papers on June 5, 2020 (Dkt. #125-129); Plaintiff's counsel filed their opposition papers on July 9, 2020 (Dkt. #133-134); and Defendants filed a reply on July 22, 2020 (Dkt. #136). Defendants' moving papers clearly recited their intent to seek an order "sanctioning Plaintiff, his counsel …, and the Derek Smith Law Group, jointly and severally." (Dkt. #125; *see also* Def. Br. 35; Def. Reply 10). However, in DSLG's memorandum of law in opposition to the motion for sanctions, it inexplicably recharacterized Defendants' motion as *not* seeking sanctions against Plaintiff (*see* DSLG Opp. 1 n.1 (citing Doe 2 Decl. ¶¶ 19-20; Doe 3 Decl. ¶ 18)), and as such did not seriously address allegations of misconduct directed at Plaintiff.

On March 12, 2021, the Court convened a conference with DSLG and Defendants to discuss whether Defendants in fact sought sanctions against Plaintiff, and if so, whether Plaintiff needed to file an independent opposition to the motion. (*See generally* Mar. 12, 2021 Hr'g Tr. (Dkt. #149)). Mr. Cohen requested leave to speak with his client and the Court set a conference for the following week to discuss the issue. (*Id.* at 9:13-24). On March 17, 2020, Plaintiff stated his intent to file, *pro se*, an independent opposition to the motion for sanctions, and the Court set a briefing schedule on Plaintiff's opposition and a sur-reply from Defendants. (*See* Minute Entry for March 17, 2021). The Court declined to grant Plaintiff's counsel an opportunity to respond. (*See* Mar. 17, 2021 Hr'g Tr. 13:25-14:4 (Dkt. #138)).

Plaintiff filed his *pro se* opposition on April 15, 2021. (Dkt. #140). In his submission, Plaintiff cited to audio recordings he had made of conversations with Mr. Cohen — without Mr. Cohen's knowledge — wherein Plaintiff and Mr. Cohen purportedly discussed how to respond to the motion for sanctions. (*See* Pl. Opp. 18).[12] Later that day, DSLG filed a letter brief seeking to withdraw as Plaintiff's counsel, which letter responded to many of the factual allegations laid out in Plaintiff's *pro se* opposition and restated its arguments in opposition to Defendants' motion for sanctions. (Dkt. #141). The next day, on April 16, 2021, Defendants filed a letter in response, which letter also revealed that defense counsel had communicated directly with Plaintiff to obtain copies of Plaintiff's audio recordings of his conversations with Mr. Cohen. (Dkt. #142). Plaintiff filed an unauthorized sur-reply the same day, and DSLG filed an unauthorized sur-reply on April 19, 2021. (Dkt. #143-144).

The Court accepted the unauthorized sur-replies (Dkt. #146) and discussed the motion to withdraw and any potential issues regarding defense counsel's contact with Plaintiff at an April 21, 2021 conference (*see generally* Apr. 21, 2021 Hr'g Tr. (Dkt. #161)). In a colloquy with the Court, DSLG responded to the arguments Plaintiff advanced in his *pro se* opposition to the motion for sanctions. (*See id.* at 20:12-28:12, 39:15-40:11). Additionally, the Court granted DSLG's motion to withdraw and the parties discussed the extent to which Plaintiff had waived the attorney-client privilege and whether defense

---

[12] Given the Court's concerns about the genesis and provenance of these recordings, it has not considered them in resolving Defendants' sanctions motion.

counsel's communications with Plaintiff were improper. (*See generally id.*).
The Court ordered Defendants to submit a letter addressing (i) defense
counsel's communications with Plaintiff, and (ii) whether any putative waiver of
Plaintiff's attorney-client privilege warranted additional discovery. (*Id.* at
35:21-37:12).

On April 23, 2021, Defendants submitted a letter disclaiming a need to
pursue additional discovery and provided the Court with documentation of
counsel's communications with Plaintiff. (Dkt. #147). Later that day, after
reviewing the documents submitted by defense counsel, the Court issued an
order declining to sanction defense counsel for communicating with Plaintiff,
because the documents revealed that Plaintiff, who has legal training, explicitly
and unequivocally instructed defense counsel to communicate directly with
Plaintiff with respect to the pending motion for sanctions. (Dkt. #148). The
Court also set a briefing schedule on Defendants' sur-reply, noting that it
would determine after receiving the sur-reply whether to accept any further
submissions on the pending motion for sanctions. (*Id.*). Defendants submitted
their sur-reply on April 29, 2021. (Dkt. #151-152).

Thereafter, on May 3, 2021, DSLG filed a renewed motion for sanctions
against Defendants, claiming that Defendants' sur-reply contained false
statements, and sought permission to file its own sur-reply. (Dkt. #153). In
support of their motion, DSLG included documents intended to disparage the
character of defense counsel, which documents were completely unrelated to
the instant motion. (*Id.*). The following day, the Court denied DSLG's motions,

noting that Mr. Cohen failed to explain why a sur-reply was warranted and explaining that defense counsel's purportedly sanctionable behavior in this case was, at base, a disagreement over the merits of the underlying sanctions motion currently pending before the Court. (Dkt. #156). Although the Court had already denied DSLG's motions, on May 5, 2021, Defendants filed an opposition and a motion to strike the exhibits disparaging defense counsel that were attached to DSLG's letter. (Dkt. #157).

On May 10, 2021, DSLG filed a letter opposing the motion to strike and requesting that the Court reconsider its decision to deny DSLG's motion to file a sur-reply, arguing that a sur-reply was required to respond to, *inter alia*, certain issues raised by Plaintiff's audio recordings of conversations with Mr. Cohen. (Dkt. #158). Later that day, Defendants filed a second motion to strike, this time arguing that DSLG's latest letter constituted an unauthorized sur-reply. (Dkt. #159). On May 11, 2021, the Court denied both of Defendants' motions to strike, explaining that to the extent DSLG had improperly attempted to supplement its June 2020 briefing in opposition to the pending motion for sanctions, the Court would discount any submissions accordingly, and noting that defense counsel had responded to allegations of misconduct on the record and that the documents filed by DSLG contained publicly available information. (Dkt. #160). The Court also denied DSLG's renewed request to file a sur-reply, noting that: (i) Mr. Cohen's disagreements with the characterization of several discovery disputes in Defendants' sur-reply were not new areas of disagreement between the parties; and (ii) Mr. Cohen

had ample opportunity to address Plaintiff's allegations, and had in fact shared his position with the Court on multiple occasions, including on the record on April 21, 2021, and in four letters to the Court. (*Id.*). The Court reiterated that it considered briefing on the pending motion for sanctions to be closed (*id.*), and accordingly Defendants' motion is now fully briefed and ripe for decision.

## DISCUSSION

### A. Applicable Law

#### 1. Sanctions Pursuant to Federal Rule of Civil Procedure 37

Federal Rule of Civil Procedure 37 provides that when "a party ... fails to obey an order to provide or permit discovery ... the court where the action is pending may issue further just orders." Fed. R. Civ. P. 37(b)(2)(A). Such just orders may include "striking pleadings in whole or in part; ... dismissing the action or proceeding in whole or in part; [or] rendering a default judgment against the disobedient party." *Id.* Further, "the court *must* order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C) (emphasis added). Several considerations inform the Court's analysis of a motion for sanctions under Federal Rule of Civil Procedure 37, including: "[i] the willfulness of the [noncompliance] or the reason for noncompliance; [ii] the efficacy of lesser sanctions; [iii] the duration of the period of noncompliance[;] and [iv] whether the noncompliant party had been warned of the consequences of

noncompliance." *Agiwal* v. *Mid Island Mortg. Corp.*, 555 F.3d 298, 302-03 (2d Cir. 2009) (internal quotation marks and alteration omitted) (quoting *Nieves* v. *City of New York*, 208 F.R.D. 531, 535 (S.D.N.Y. 2002)); *accord Doe* v. *Delta Airlines Inc.*, 672 F. App'x 48, 50 (2d Cir. 2016) (summary order).

### 2. Sanctions Pursuant to the Court's Inherent Powers and 28 U.S.C. § 1927

The Court has "inherent power to supervise and control its own proceedings and to sanction counsel or a litigant for bad-faith conduct." *Sussman* v. *Bank of Israel*, 56 F.3d 450, 459 (2d Cir. 1995); *see also Chambers* v. *NASCO, Inc.*, 501 U.S. 32, 45-46 (1991) ("[A] court may assess attorney's fees when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons'" (quoting *Alyeska Pipeline Serv. Co.* v. *Wilderness Soc'y*, 421 U.S. 240, 258-59 (1975))); *see generally Int'l Techs. Mktg., Inc.* v. *Verint Sys., Ltd.*, 991 F.3d 361, 367 (2d Cir. 2021). On top of this inherent power, 28 U.S.C. § 1927 authorizes a court to require an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously ... to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927; *see also Madison 92nd St. Assocs., LLC* v. *Marriott Int'l, Inc.*, No. 13 Civ. 291 (CM), 2013 WL 5913382, at *12 (S.D.N.Y. Oct. 31, 2013) ("The purpose of § 1927 is to ensure that those who create unnecessary costs also bear them."), *aff'd sub nom. Boies, Schiller & Flexner LLP* v. *Host Hotels & Resorts, Inc.*, 603 F. App'x 19 (2d Cir. 2015) (summary order).

To impose sanctions under either authority, the trial court must find "clear evidence that the conduct at issue is [i] entirely without color and

[ii] motivated by improper purposes." *Wolters Kluwer Fin. Servs., Inc.* v. *Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009); *see generally Sorenson* v. *Wolfson*, 683 F. App'x 33, 37 (2d Cir. 2017) (summary order) (discussing sanctions imposed under the inherent powers doctrine and 28 U.S.C. § 1927). Regarding the first prong, "[c]onduct is entirely without color when it lacks any legal or factual basis; it is colorable when it has some legal and factual support, considered in light of the reasonable beliefs of the attorney whose conduct is at issue." *Scivantage*, 564 F.3d at 114 (citing *Schlaifer Nance & Co.* v. *Est. of Warhol*, 194 F.3d 323, 338 (2d Cir. 1999)). The second prong requires the district court to find a clear showing of bad faith with a high degree of factual specificity in most cases. *See United States* v. *Seltzer*, 227 F.3d 36, 41-42 (2d Cir. 2000); *Oliveri* v. *Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986). Under this requirement, sanctions are appropriate only "when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Oliveri*, 803 F.2d at 1273; *see also Int'l Techs. Mktg., Inc.*, 991 F.3d at 367-68.

## B.  Analysis

Broadly speaking, Defendants seek sanctions against the following parties for the following conduct:

- against Plaintiff, Mr. Cohen, and DSLG for intentionally or recklessly lying to the Court about the parties to, the damages sought in, and the nature of the claims in the Bronx Action;

- against Mr. Cohen and DSLG for colluding with Dr. Siegel to perpetuate an improper scheme

whereby DSLG hires Dr. Siegel to write favorable reports on behalf of its clients; and

- against Plaintiff, Mr. Cohen, and DSLG for obstructing discovery by willfully or recklessly failing to comply with discovery orders, including by concealing unfavorable facts throughout the course of litigation.

(*See generally* Def. Br.; Def. Reply; Def. Sur-Reply; *see also* Def. Br. 32-33).

The Court addresses each of these three allegations — categorized for convenience as (i) misrepresentation, (ii) collusion, and (iii) obstruction — in turn, first addressing Defendants' motion for sanctions against Mr. Cohen and DSLG, and then resolving Defendants' motion for sanctions against Plaintiff.

### 1. The Court Grants in Part Defendants' Motion for Sanctions Against Plaintiff's Former Counsel

Before a district court may impose sanctions directly against an attorney, the Second Circuit has explained that, "under basic principles of due process":

> [a]n attorney whom the court proposes to sanction must receive specific notice of the conduct alleged to be sanctionable and the standard by which that conduct will be assessed, and an opportunity to be heard on that matter, and must be forewarned of the authority under which sanctions are being considered, and given a chance to defend himself against specific charges.

*Wilson* v. *Citigroup, N.A.*, 702 F.3d 720, 725 (2d Cir. 2012) (internal quotation marks omitted) (quoting *Sakon* v. *Andreo*, 119 F.3d 109, 114 (2d Cir. 1997)).

Following the Second Circuit's directive, the Court explained that it was considering the imposition of sanctions pursuant to its inherent powers, Rule 11, Rule 37, and 28 U.S.C. § 1927, and discussed the legal and factual bases for Defendants' anticipated motion for sanctions at length with the

parties on the record on February 28, 2020. (*See* Feb. 28, 2020 Hr'g Tr. 8:6-18:18). Defendants further explained the factual bases for their motion and the legal authority pursuant to which they sought sanctions in their opening brief (*see generally* Def. Br.), and Mr. Cohen and DSLG were provided ample opportunity to be heard on the matter in an opposition brief (*see generally* Pl. Opp.), on the record at several conferences with the Court (*see generally* Feb. 28, 2020 Hr'g Tr.; Mar. 12, 2021 Hr'g Tr.; Mar. 17, 2021 Hr'g Tr.; Apr. 21, 2021 Hr'g Tr.), and in several supplementary letters (*see, e.g.*, Dkt. #121, 141, 144, 153, 158). For the reasons discussed herein, the Court sanctions Mr. Cohen and DSLG for misrepresentations to the Court, but declines to impose sanctions on Mr. Cohen or DSLG for obstruction or collusion.

### a.  Misrepresentation

The most serious allegation of misconduct currently before the Court is that Mr. Cohen and DSLG misrepresented the nature and the scope of the Bronx Action to the Court. (*See* Def. Br. 19-22; Def. Sur-Reply 4-6). A review of the complaint in the Bronx Action demonstrates a direct and irreconcilable conflict with Plaintiff's claims in this litigation. As noted above, Plaintiff filed his complaint in the Bronx Action on September 19, 2018, approximately three months before initiating this lawsuit. (*See generally* Bronx Action Compl.). There, Plaintiff alleged that at the time that Sewell and the other Bronx Action defendants purportedly defrauded him, in early 2018, he had already overcome any emotional distress caused by the conduct at issue in this case, and thus

that any residual emotional distress was attributable solely to the Bronx Action defendants. (*See id.* at ¶¶ 72, 450, 457, 471-507, Ex. J, K).

At the moment Plaintiff filed the complaint in this case, he was already arguing in the Bronx Action that any emotional distress incurred as a result of Defendants' conduct had long abated. (*See* Bronx Action Compl. ¶¶ 471-507). Indeed, in support of his request for emotional distress damages in the Bronx Action, Plaintiff submitted as exhibits to his complaint the *very same* treatment notes from his Initial Providers that had been submitted as evidence of emotional distress in this case. (*Compare id.*, Ex. J, K, *with* Pl. Tr. Ex. 5). Put differently, Plaintiff simultaneously pursued two cases in which he sought to recover for *the same purported emotional distress*; however, there was, and there could be, no overlap between the two theories of recovery.[13] Nevertheless, in this action Plaintiff: (i) never disclosed the nature or even the existence of the emotional distress claims advanced in the Bronx Action; (ii) continued to seek emotional distress damages without any offset for the emotional distress purportedly attributable solely to the Bronx Action defendants; (iii) testified under oath that there were no other factors that contributed to his emotional distress; and (iv) testified that he did not suffer any emotional damage as a result of the conduct complained of in the Bronx Action. (*See* Pl. Dep. 324:15-325:15, 326:12-17 (disclaiming that Plaintiff

---

[13]     To be clear, the Court is not stating that it is impossible for Plaintiff to have suffered harm due to the conduct both of Defendants in this case and of the Bronx Action defendants. Rather, it is Plaintiff's characterization of — and sworn testimony and statements about — the emotional distress damages in each case that is incompatible.

suffered any emotional suffering or distress as a result of his other litigation);
*see also* Siegel Dep. 58:6-59:20, 73:17-75:17, 105:6-106:18 (admitting that
Plaintiff's damages expert did not know about the Bronx Action or any of
Plaintiff's other litigations)).  Disclosure of the Bronx Action and the nature of
the claims asserted therein would have dramatically altered the instant
litigation.  On this point, the Court does not even need to hypothesize, since
disclosure of this information on the eve of trial ultimately precipitated
Plaintiff's voluntary dismissal of this case.

As noted previously, "[i]mposition of sanctions under a court's inherent
powers requires a specific finding that an attorney acted in bad faith," and
such sanctions "are appropriate only if there is clear evidence that the conduct
at issue is [i] entirely without color and [ii] motivated by improper purposes."
*Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009); *see also Revson* v. *Cinque &
Cinque, P.C.*, 221 F.3d 71, 79 (2d Cir. 2000).  Defendants frame the failure by
Plaintiff and his counsel to disclose this information as part of a bad faith effort
to disclose only favorable facts while concealing all unfavorable information
throughout the course of this litigation.  (*See, e.g.*, Def. Br. 28-30).  In
opposition, DSLG argues that its failure to disclose this information was due to
counsel's excusable ignorance as to the scope and nature of the Bronx Action;
that any misrepresentations made to the Court were made in good faith and to
the best of counsel's knowledge at the time; and that Plaintiff had instructed
DSLG that his other litigation was not relevant and should not be disclosed.

(Dkt. #141; *see also, e.g.*, Cohen Decl. ¶¶ 3-5; DSLG Opp. 13, 25-26; Dkt. #158).[14]

While the Court is sympathetic to Defendants' framing of this issue, especially given DSLG's and Mr. Cohen's other failings in this litigation, it cannot conclude that counsel withheld this information in bad faith and for improper purpose *ab initio*. It appears from the record before the Court that Mr. Cohen and DSLG failed to conduct even basic due diligence in investigating the Bronx Action, which was already underway when this case was filed. And this dereliction was not the product of any concealment on Plaintiff's part; to the contrary, by May 2019, Plaintiff had disclosed the existence of the action to DSLG, noted that he intended to pursue intentional infliction of emotional distress damages against Sewell, and given DSLG enough information to have discovered the true nature and scope of his claims in the Bronx Action. (*See* Pl. Decl., Ex. P, R). Had only DSLG bothered to read the Bronx Action Complaint, counsel would have seen the obvious conflict between the damages

---

[14]    DSLG argues that it cannot be sanctioned pursuant to Fed. R. Civ. P. 37 for its failure to disclose information about the Bronx Action because Defendants never moved to compel a response to Interrogatory 10 or Request for Production 52. (DSLG Opp. 24-26). The Court need not address this argument because, as discussed herein, it is imposing sanctions for DSLG's misconduct under its inherent power and 28 U.S.C. § 1927.

Relatedly, DSLG argues that Defendants should have investigated the Bronx Action sooner, and as such DSLG should not be sanctioned for defense counsel's failure to fully investigate this issue. (*See, e.g.*, Dkt. #141). This argument is without merit for myriad reasons. *First*, as the Court has already explained, Defendants cannot be faulted for relying on Plaintiff's misrepresentations when Plaintiff's counsel failed to correct them. (*See, e.g.*, Feb. 27, 2020 Hr'g Tr. 25:12-26:3; Feb. 28, 2020 Hr'g Tr. 5:11-18). *Second*, as noted on the record, information about the Bronx Action was not readily available, and as such, even a diligent search would not have revealed this misrepresentation. (*See* Feb. 27, 2020 Hr'g Tr. 14:7-15:19).

claimed in this case and Plaintiff's sworn statements in the Bronx Action. This review would have afforded them several options: (i) they could have corrected or prevented Plaintiff's false and perjurious statements as to the nature of the Bronx Action and its relationship to this case; (ii) they could have attempted to circumscribe the emotional distress damages Plaintiff sought here; or (iii) they could have convinced Plaintiff not to pursue either or both of the two actions. Instead, the most charitable reading of the record for Plaintiff's counsel suggests that Mr. Cohen and DSLG did not review the Bronx Action Complaint or any other filings in the Bronx Action until the Thursday evening before trial. (*See* Feb. 27, 2020 Hr'g Tr. 4:3-6:17, 7:13-25; *see also* Dkt. #141).

While not accepting it as a complete justification, the Court largely credits Mr. Cohen's representation that "[a]t all times material, [he] was only generally aware of a fee dispute between Plaintiff and his prior attorney, and nothing further," which impression was reinforced, or at least not refuted, by Plaintiff throughout the litigation. (Dkt. #141; *see also* Pl. Decl., Ex. R (referring to the Bronx Action as one "against [Plaintiff's] previous attorney for fees"); Pl. Decl., Ex. P (disclosing an intent to pursue intentional infliction of emotional distress claims, but only against Sewell)). The Court also accepts Mr. Cohen's representation that he took his client's word that the Bronx Action was not relevant to this case (*see, e.g.*, Pl. Decl., Ex. B (instructing DSLG to object to DSLG's disclosure of Plaintiff's other litigation on relevance grounds)), even if it may have been incautious for Mr. Cohen to accept that representation without doing any due diligence. As such, although Mr. Cohen's initial failure

to investigate this issue bespeaks deficiencies of professional responsibility —
and although any legal or factual argument DSLG may offer in support of any
decision to conceal this litigation is "meritless" — the Court cannot find that
this initial failure was made in bad faith or for "improper purposes." *Revson*,
221 F.3d at 79.

The Court's generosity of spirit is not boundless, however. Later in the
litigation, Mr. Cohen and DSLG made what turned out to be material
misrepresentations to the Court in their filings and then doubled down on
these misrepresentations. From this point forward, DSLG's "good faith"
argument is no longer viable, and sanctions are appropriate both under the
Court's inherent powers and 28 U.S.C. § 1927.

In Plaintiff's tenth motion *in limine* seeking to exclude evidence of his
"unrelated litigation," filed on January 13, 2020, Mr. Cohen wrote:

> Plaintiff anticipates Defendants will seek to ask Plaintiff
> questions about a fee dispute between Plaintiff and his
> attorney in another case [*i.e.*, the Bronx Action], prior
> claims Plaintiff raised against a past employer in
> Russia, and Plaintiff's workers['] compensation claims
> against Trader Joes. Defendants should be prohibited
> from discussing, asking questions relating to, or
> presenting evidence having to do with any unrelated
> litigation.
>
> Simply put, any other litigation concerns different
> defendants, different allegations, and entirely unrelated
> incidents. Evidence of other litigation is irrelevant to
> any issue in this case and therefore, is inadmissible
> pursuant to FRE 401 and 402.
>
> In the alternative, and should the evidence at issue be
> deemed relevant, it should still be excluded under Rule
> 403. The allegation central to other litigation would
> only serve to confuse the issues, mislead the jury,

> unfairly prejudice Plaintiff and would serve no
> legitimate purpose.

(Dkt. #86 at 7). By this point, Mr. Cohen and DSLG could no longer willfully

blind themselves to the nature of their client's other litigations. After all,

Federal Rule of Civil Procedure 11(b) was now implicated, which provides, in

relevant part, that:

> [b]y presenting to the court a pleading, written motion,
> or other paper ... an attorney ... certifies that to the best
> of the person's knowledge, information, and belief,
> formed after an inquiry reasonable under the
> circumstances:
>
> (1) it is not being presented for any improper purpose,
> such as to harass, cause unnecessary delay, or
> needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are
> warranted by existing law or by a nonfrivolous
> argument for extending, modifying, or reversing existing
> law or for establishing new law;
>
> (3) the factual contentions have evidentiary support or,
> if specifically so identified, will likely have evidentiary
> support after a reasonable opportunity for further
> investigation or discovery; and
>
> (4) the denials of factual contentions are warranted on
> the evidence or, if specifically so identified, are
> reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b). The rule imposes on attorneys "an affirmative duty to

conduct a reasonable inquiry into the facts and the law before filing." *Bus.

Guides, Inc.* v. *Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 551 (1991).

Contrary to counsel's representations in the tenth motion *in limine* that

the Bronx Action concerned only "a fee dispute between Plaintiff and his

attorney in another case," was "irrelevant," and that its disclosure "would serve

no legitimate purpose," the Bronx Action was directly relevant to — if not dispositive of — the emotional distress damages sought in this case. Mr. Cohen proactively made material misrepresentations in this motion *in limine* to gain a strategic advantage, as he sought to keep evidence of the Bronx Action and Plaintiff's other litigation from the jury at trial. While the Court is foreclosed for procedural reasons from imposing sanctions under Rule 11 for this specific misrepresentation,[15] the fact remains that in signing the moving papers, Mr. Cohen attested that he had made the necessary inquiry into the factual allegations substantiating the claims. As such, any misrepresentations about the nature of, parties to, or scope of the Bronx Action from this filing forward could not have been made in good faith and could only have been made with improper purpose — for example, as here, to gain a strategic advantage at trial, with reckless disregard for the truth.

Therefore, sanctions are rightfully imposed to allow Defendants to recover those attorneys' fees and costs that were incurred after the filing of Plaintiff's tenth motion *in limine* on January 13, 2020, on account of Mr. Cohen's and DSLG's affirmative misrepresentations to the Court regarding the Bronx Action. After filing a motion *in limine* that sought to capitalize on

---

[15]     For avoidance of doubt, the Court believes DSLG's January 13, 2020 motion *in limine* seeking to exclude evidence of Plaintiff's other litigation violated Rule 11 of the Federal Rules of Civil Procedure. However, the procedural prerequisites to impose sanctions under Rule 11 for this filing are not satisfied here, and therefore the Court is forced to rely on its inherent power and 28 U.S.C. § 1927. Ironically, it is only because of the misconduct of Plaintiff and his counsel in concealing and/or failing to disclose this evidence that the Court and Defendants lacked information sufficient to cause them to invoke the procedures of Rule 11.

Plaintiff's failures to disclose, Plaintiff's counsel then strove to exacerbate the problems faced by the Court and defense counsel because of that non-disclosure. Among other things, after the Court explicitly asked Plaintiff's counsel about the nature of the Bronx Action and whether Plaintiff was engaged in litigation against Fordham or against any parties other than Sewell, Plaintiff's counsel responded that he was not. (Feb. 21, 2020 Hr'g Tr. 20:1-22). In so doing, Mr. Cohen made another affirmative — and false — representation to the Court, and one that he made no effort to clarify or correct in the days and pretrial conferences that followed. Here, as with the motion *in limine*, the Court can only conclude that Mr. Cohen engaged in this conduct with the improper purpose of gaining a strategic advantage at the expense of the truth: minimizing the Bronx Action to preclude it from coming in at trial. Nor can Mr. Cohen's explanation — which amounts to willful inattention to the underlying facts — excuse his false statements, since he had previously certified to the Court that he had made the necessary inquiry into the factual allegations substantiating these claims. *See* Fed. R. Civ. P. 11(b); *see also Malvar Egerique* v. *Chowaiki*, No. 19 Civ. 3110 (KPF), 2020 WL 1974228, at *32 (S.D.N.Y. Apr. 24, 2020) (finding that counsel was "responsible for the inaccurate factual allegations" because "counsel signed the [filing], indicating that he made the necessary inquiry into the factual allegations substantiating the claims").

Whether careless or strategic, Mr. Cohen's failure to investigate resulted in unnecessary expenditures as the parties and the Court geared up for trial. Instead, it was *defense counsel* who finally notified the Court as to the truth —

more than a month later and less than a week before trial was to begin. (*See* Dkt. #96).[16]  But even after receiving and reviewing Defendants' letter highlighting the misrepresentation and its obvious materiality to the instant litigation and impending trial, DSLG still did not investigate the Bronx Action. (Feb. 27, 2020 Hr'g Tr. 4:3-17).  That was made clear in Mr. Cohen's colloquy with the Court at the conference held the next day:

> THE COURT:  I see.  But, sir, I asked you on Friday a specific question about Fordham University and you spoke falsely to me.  Why did you do that?  And why is it that I have to, in order to keep this case honest, why am I out there digging up dockets from other cases?  Why can't I trust that when I ask you a question about a litigation that you will answer me correctly and honestly about it.
>
> MR. COHEN:  Absolutely, your Honor.  And when I spoke to you on Friday I really had no idea that Fordham was a named party in this suit.  I just thought, you know, from speaking to my client, that there was a litigation between him and his former attorney.  I had no idea that Fordham was named, that Fordham was involved.

(*Id.* at 7:13-25).  Inasmuch as this is another instance in which Mr. Cohen made affirmative misrepresentations to the Court without undertaking the necessary inquiry into his client's claims — the Court can discern no colorable basis for this argument, nor good faith explanation for counsel's factual misrepresentation.

---

[16]    As explained above, uncovering the truth about the Bronx Action required defense counsel to physically go to the courthouse to view the records, and required the Court to reach out to the presiding judge to obtain records because the records were unavailable online.  (*See* Feb. 27, 2020 Hr'g Tr. 14:7-15:19; Feb. 28, 2020 Hr'g Tr. 2:18-21).

DSLG's misrepresentations did not end there, as the Court later learned that Plaintiff had two appeals pending before the First Department, rather than the one that Plaintiff's counsel had led the Court to believe. (*See* Dkt. #93; Feb. 21 Hr'g Tr. 18:13-15). When pressed on this misrepresentation, Mr. Cohen continued to plead ignorance, despite being on notice that he had already made several misrepresentations to the Court with respect to this very issue. (Feb. 28, 2020 Hr'g Tr. 3:3-25). At the same conference, on DSLG's advice, Plaintiff voluntary dismissed all his claims. (*Id.* at 6:2-18).

In sum, DSLG's misrepresentations to the Court — starting with the tenth motion *in limine*, continuing with an affirmative misrepresentation to the Court on February 21, 2020, and concluding with repeated failures to correct or investigate the very misrepresentations the Court had already brought to DSLG's attention — demonstrates a complete disregard for the judicial process. As a result of Plaintiff's counsel's conduct, the Court and the parties expended significant resources preparing for trial, investigating Plaintiff's other litigation, preparing letters about and repeatedly conferring about this litigation, and separating DSLG's misrepresentations from the truth. Because Mr. Cohen and DSLG "acted in bad faith, vexatiously, wantonly, [and] for oppressive reasons," *Chambers*, 501 U.S. at 45-46, the Court finds that sanctions should be imposed in order "that those who create unnecessary costs also bear them[,]" *Madison 92nd St. Assocs., LLC*, 2013 WL 5913382, at *12.

Therefore, the Court sanctions Mr. Cohen and DSLG pursuant to 28 U.S.C. § 1927 and its inherent powers to permit Defendants to recover

attorneys' fees and costs incurred following the submission of tenth motion *in limine* filed on January 13, 2020, up through the voluntary dismissal of this case on February 28, 2020, as well as for the costs associated with seeking leave to file and filing the instant motion for sanctions.

### b. Collusion

Turning now to Defendants' allegations of collusion between DSLG and Dr. Siegel, the Court finds that Defendants have not established the existence of a pattern or practice of misconduct. The record establishes that DSLG was reckless in working with Dr. Siegel in this case, that the latter's methodology is suspect, and that his professional opinion perhaps ought to be afforded little weight, but not that sanctions are warranted.

To support their argument, Defendants: (i) point to defense counsel's experience with DSLG and Mr. Siegel in a similar employment discrimination case (the "*Cooper* Matter"); (ii) cite to a handful of other cases where Dr. Siegel reviewed no medical records; (iii) note that Dr. Siegel has been retained by DSLG in more than 170 cases; and (iv) highlight that Dr. Siegel is purportedly related to a high-ranking partner at DSLG. (*See, e.g.*, Def. Br. 14-18, 31-32). After carefully reviewing this evidence, the Court cannot conclusively determine that DSLG and Dr. Siegel have engaged in a fraudulent scheme spanning multiple litigations. For starters, the Court hesitates to find that the events surrounding Dr. Siegel's report and testimony in this case are identical to those

in the *Cooper* matter, as Mr. Cohen was not involved in the *Cooper* Matter.[17]

Nor can the Court confidently conclude that Dr. Siegel *never* reviews medical records from the smattering of cases Defendants cite. The Court believes this evidence may be considerable ammunition for cross-examination or a *Daubert* motion, but is not — without more — sufficient proof of a fraudulent conspiracy warranting sanctions.

While the Court cannot on this record find that DSLG and Dr. Siegel operated a fraudulent scheme, it pauses briefly to note that DSLG recklessly or willfully failed to disclose relevant information to Dr. Siegel, and then failed to correct those omissions even after the Court ordered the same information to be disclosed to Defendants. (*See* Siegel Dep. 28:21-23, 43:8-19; *see also id.* at 72:12-81:10 (denying that Dr. Siegel reviewed records from each mental health and medical care provider disclosed to Defendants at the time of his deposition)).[18] That is, Plaintiff and DSLG disclosed only favorable facts to Dr. Siegel and concealed all other relevant evidence, even after the Court compelled Plaintiff to disclose information regarding other medical providers to Defendants, and even after it explicitly found their relevance to Plaintiff's emotional distress claims. Still and all, Dr. Siegel's failure to obtain relevant

---

[17]    Furthermore, Judge Stein declined to sanction DSLG for conduct arising out of the purportedly identical misconduct in the *Cooper* Matter. *See Cooper* v. *Upstairs, Downstairs of N.Y., Inc.*, No. 18 Civ. 6426 (SHS), 2021 WL 1172477, at *8 (S.D.N.Y. Mar. 29, 2021).

[18]    As noted above, prior to Dr. Siegel's deposition, on October 29, 2019, he issued an addendum to the Siegel Report stating that his "office requested [Plaintiff's] medical records from the Derek Smith Law Group but received none." (Shanahan Reply Decl., Ex. AA). Dr. Siegel did not issue any further addenda to his report.

information, his "troubling" business model, and his suspect methodology are all suitable fodder for cross-examination, but not sufficiently "improper," individually or in the aggregate, to warrant sanctions. (Nov. 26, 2019 Hr'g Tr. 11:8-16, 29:24-30:11).

### c. Obstruction

The Court next addresses Defendants' argument that Mr. Cohen's and DSLG's conduct throughout the course of this litigation served to obstruct discovery for improper purposes and in bad faith. (*See* Def. Br. 4-14, 32-33; Def. Reply 8-10). In this regard, Defendants allege that Plaintiff and his counsel obstructed discovery by withholding relevant and responsive information about Plaintiff's: (i) asylum application; (ii) workers' compensation claim; (iii) medical service providers other than the Initial Providers; and (iv) medical records. (*See id.*).[19] In opposition, DSLG argues that it did not advance meritless claims in discovery, did not act with improper purpose in objecting to Defendants' discovery requests, and complied with the Court's orders compelling the production of discovery. (*See* DSLG Opp. 23-24, 28-30; *see also, e.g.*, Dkt. #158). Relatedly, DSLG observes that the Court has already declined to sanction Plaintiff or DSLG for some of the same conduct at issue here. (*See* DSLG Opp. 20; *see also, e.g.*, Dkt. #121).

---

[19] Defendants also allege obstruction in the concealment of the Bronx Action, which issue is discussed *supra*. The Court declines to hold Plaintiff's counsel responsible for failing to disclose information about the workers' compensation claim because the record is not clear as to whether Plaintiff disclosed this information to counsel before disclosing it for the first time at his deposition.

As an initial matter, the Court rejects DSLG's argument that Defendants are improperly seeking reconsideration of the Court's prior denials of sanctions motions for Plaintiff's failures to produce various HIPAA releases, medical care providers, and his asylum application. (*See* DSLG Opp. 20 & n.43). The Court denied each of those motions based on the record before the Court at that time. After reviewing the parties' submissions in connection with the instant motion, the Court understands Defendants to be aggregating Plaintiff's and DSLG's repeated failures to disclose relevant information and asking the Court to consider this misconduct in its totality. The Court will do so; to do otherwise would only serve to incentivize accretive misconduct.[20]

Reviewing the record in full, the Court finds that DSLG's obstructionist conduct was "entirely without color." *Scivantage*, 564 F.3d at 114. Specifically, the record establishes a pattern of reckless obstruction in discovery, as Defendants were forced to file multiple motions to obtain basic information about this litigation that should have been disclosed: (i) in Plaintiff's Rule 26(a) initial disclosures, (ii) in Plaintiff's initial responses to Defendants' first requests for production and interrogatories, and (iii) in compliance with Court orders granting Defendants' motions to compel. As but one example, despite interrogatories, requests for productions, and at least one Court order compelling production, Plaintiff's counsel did not disclose several medical care providers until Plaintiff's deposition in September 2019. (*See,*

---

[20]     As it happens, the sanctions the Court imposes in this Opinion are designed to compensate Defendants, not for the various discovery disputes in the matter, but rather for the protraction and subversion of the litigation process in the runup to the trial.

*e.g.*, Oct. 15, 2019 Hr'g Tr. 8:12-16).  Yet the record demonstrates that Plaintiff

supplied DSLG with information about these providers as early as May 2019.

(Pl. Decl., Ex. T).  Had Mr. Cohen or DSLG simply looked at the records for any

of these undisclosed providers, it would have been immediately apparent that

the information was relevant to Plaintiff's claims and responsive to Defendants'

discovery requests.  (*See, e.g.*, Oct. 15, 2019 Hr'g Tr. 9:19-10:12 (overruling

DSLG's objections to production of previously undisclosed medical records and

workers' compensation claims)).

Similarly, a review of Plaintiff's asylum application demonstrates that

DSLG's arguments in opposition to its disclosure and in opposition to the

production of HIPAA releases for medical care providers referenced in the

application either were frivolous or deliberately misrepresented the contents of

the asylum application, as the application clearly implicated Plaintiff's

emotional distress claims.  (*Compare* Dkt. #39 (Plaintiff's objections to the

production of the asylum application), *and* Dkt. #47 (Plaintiff's objections to the

production of HIPAA releases), *with* Dkt. #48-1 (excerpt from Plaintiff's asylum

application making extensive claims regarding Plaintiff's physical and mental

health); *see also* Aug. 6, 2019 Hr'g Tr. 18:23-19:14).  Thus, it is clear to this

Court that DSLG "acted 'without a colorable basis,'" *Boies, Schiller & Flexner*

*LLP*, 603 F. App'x at 20 (quoting *Enmon* v. *Prospect Cap. Corp.*, 675 F.3d 138,

143 (2d Cir. 2012)), in consistently failing to disclose obviously relevant information and documents in its possession.[21]

However, it is less clear that DSLG acted with "improper motive" or for "improper purposes," as is typically required for a showing of bad faith in this context. *See Scivantage*, 564 F.3d at 114; *Revson*, 221 F.3d at 79. While Defendants see DSLG's obstruction as part of an overarching fraudulent scheme to disclose only favorable facts (*see, e.g.*, Def. Br. 25), the Court perceives more incompetence than malevolence in DSLG's conduct. That is, rather than affirmatively concealing unfavorable documents, it appears instead that Mr. Cohen and DSLG: (i) failed to conduct any due diligence; (ii) failed to review the contents of documents and as such had no knowledge as to whether documents were in fact relevant; and (iii) deferred to Plaintiff's characterization of evidence and relevant documents without independently reviewing or verifying such claims. Stated colloquially, Mr. Cohen and DSLG were asleep at the wheel at various points in this case, allowing Plaintiff to intentionally withhold and conceal relevant information, including his medical history, employment history, and litigation history. While the Court finds counsel's insouciance to tack extremely close to bad faith, "[t]he power to assess the fees

---

[21] The Court categorically rejects DSLG's argument that it cannot be sanctioned because it eventually produced HIPAA releases and Plaintiff's asylum application in compliance with Court orders. (DSLG Opp. 23-24, 26-31). Obstruction with respect to some documents is not obviated by the production of other documents, especially when those documents were only produced over the objections of the sanctioned party and pursuant to a Court order to compel production. *See Nittolo* v. *Brand*, 96 F.R.D. 672, 677 (S.D.N.Y. 1983) ("Plaintiff may not properly escape the consequences of his own wrongful conduct because the defendants were diligent and persistent enough to overcome the obstacles which he placed in their path.").

against an attorney should be exercised with restraint." *Colucci* v. *N.Y. Times Co.*, 533 F. Supp. 1011, 1014 (S.D.N.Y. 1982). For that reason, the Court declines to impose sanctions for this conduct pursuant to its inherent powers and 28 U.S.C. § 1927.[22]

Nevertheless, the record in this case reveals a concerning disregard for the judicial process, as DSLG repeatedly failed to disclose highly relevant material throughout discovery. There must be a line at which counsel's inattention to basic requirements of litigation — for example, failing to conduct due diligence before initiating an action or recklessly advancing factually unfounded arguments — becomes sanctionable, even if such misconduct is more akin to willful blindness than to deliberate fraud. The Court believes the record does not adequately establish that Mr. Cohen and DSLG have been appraised of this line, because, to the Court's knowledge, neither Mr. Cohen nor DSLG has been warned that future misconduct of this nature will result in sanctions. This Court now does.

This Opinion serves as a formal warning that the conduct in this case exists in the gray area between incompetence and bad faith. *See Penthouse Int'l, Ltd.* v. *Playboy Enters., Inc.*, 663 F.2d 371, 388 (2d Cir. 1981) ("[I]t is

---

[22]    For the same reason, the Court does not believe sanctions are warranted pursuant to Fed. R. Civ. P. 37 for this obstruction. *See Arrowhead Cap. Fin., Ltd.* v. *Seven Arts Ent., Inc.*, No. 14 Civ. 6512 (KPF), 2016 WL 4991623, at *19-20 (S.D.N.Y. Sept. 16, 2016) (stressing the importance of willfulness in determining whether Rule 37 sanctions are justified), *opinion withdrawn in part on reconsideration*, No. 14 Civ. 6512 (KPF), 2017 WL 1653568 (S.D.N.Y. May 2, 2017), *and aff'd*, 739 F. App'x 701 (2d Cir. 2018) (summary order). Additionally, Rule 11 was amended in 1993 to exclude sanctions arising from discovery disputes, and thus Rule 11 sanctions are not proper here. *See* Fed. R. Civ. P. 11(d).

questionable whether [counsel] intentionally ... misrepresented to the court material facts with respect to the existence of the relevant ... records. It is conceivable that he was misled by his client. However, the record does support ... [the] finding that [counsel] ... was grossly negligent in not pursuing the matter more diligently to ascertain the facts from his client[.]"); *cf. Jimenez* v. *City of New York*, 166 F. Supp. 3d 426, 431-32 (S.D.N.Y. 2016) (finding that attorney acted in bad faith where he demonstrated "willful blindness" to "absolutely fanciful" statements by his client). Therefore, although the Court does not now sanction Mr. Cohen or DSLG for obstructive conduct that it believes is sanctionable, it warns them that future misconduct of this kind will be considered sanctionable by this Court and sister courts in this District.

### 2. The Court Sanctions Plaintiff

While the misconduct of Plaintiff's former counsel may be attributable to a combination of recklessness and indifference, the record reveals a much more willful pattern of obstruction and deception carried out by Plaintiff. Plaintiff consistently and systematically concealed relevant and unfavorable facts and documents: first from his former counsel, and later from Dr. Siegel, Defendants, and the Court. For the reasons that follow, the Court sanctions Plaintiff pursuant to Rule 37 of the Federal Rules of Civil Procedure and the Court's inherent powers for misconduct related to obstruction in discovery, including misrepresentations regarding the Bronx Action.

Defendants argue that Plaintiff and his former counsel waged a systematic campaign of obstruction by repeatedly failing to disclose relevant

information throughout the course of litigation, including: (i) Plaintiff's medical care providers (beyond the Initial Providers); (ii) Plaintiff's asylum application; (iii) Plaintiff's workers' compensation claim; and (iv) information about Plaintiff's other litigation, including the Bronx Action.  (*See* Def. Br. 23-24; Def. Sur-Reply 2-6, 8).  Defendants also argue that Plaintiff's failure to disclose this same information to Dr. Siegel is further evidence of Plaintiff's obstructive scheme.  (Def. Sur-Reply 9, 13-14).  This obstruction led to serious and completely unnecessary expenditures of time and resources, both in Defendants' repeated motions to compel and, more importantly, in Plaintiff's unreasonable maintenance of factually and legally unsupportable claims.

Evidence of Plaintiff's efforts to cherry-pick favorable facts for disclosure is clear from the very beginning of this case.  For example, Plaintiff's April 2019 disclosures to his counsel in response to Defendants' initial discovery requests demonstrate that he only disclosed to DSLG the Initial Providers — providers he only saw after leaving employment with the Club and with whom he largely discussed the claims asserted in this case — while proffering formalistic legal objections to the disclosure of any other providers in responding to DSLG's inquiries.  (*See* Pl. Decl., Ex. B).  DSLG's incomplete response to Interrogatory 4 and the motion practice that followed is the direct result of Plaintiff's failure to produce a full list of his medical care providers to his attorneys for them to determine which were relevant.[23]

---

[23]    As noted above, Plaintiff did disclose additional care providers in May 2019 after initial discovery responses were served and after the Court compelled production of Plaintiff's asylum application.  (*See* Pl. Decl., Ex. T).  The asylum application revealed several

Once the compelled documents were actually produced — including the asylum application, the names of Plaintiff's undisclosed medical care providers, and the medical records from those providers — their obvious relevance to Plaintiff's emotional distress damages became apparent. *Cf. Arrowhead Cap. Fin., Ltd.* v. *Seven Arts Ent., Inc.*, No. 14 Civ. 6512 (KPF), 2016 WL 4991623, at *19-20 (S.D.N.Y. Sept. 16, 2016) (sanctioning litigant where litigant repeatedly obstructed discovery by baselessly claiming information sought was irrelevant), *opinion withdrawn in part on reconsideration on other grounds*, No. 14 Civ. 6512 (KPF), 2017 WL 1653568 (S.D.N.Y. May 2, 2017), *and aff'd*, 739 F. App'x 701 (2d Cir. 2018) (summary order). Furthermore, the Court's review of Plaintiff's disclosures to his former counsel — submitted by Plaintiff in opposition to the instant motion — show him directing counsel to object to the production of information and documents that he knew or should have known were relevant (especially given his legal training), offering flimsy legal arguments in support of his instructions to object, and misleading his counsel as to the contents of certain of the documents he sought to shield from disclosure. (*See* Pl. Decl., Ex. B, C, F).

Further evidence of Plaintiff's concerted effort to shield relevant facts and documents from disclosure is contained in his selective disclosures to Dr. Siegel. Plaintiff failed to disclose information about his employment history,

medical providers that Plaintiff failed to disclose to DSLG, highlighting that Plaintiff saw fit to disclose additional providers to his lawyers only after he had already been caught concealing information from them. DSLG's failure to supplement Plaintiff's initial responses with this additional information is discussed *supra*.

medical history, mental health history, and litigation history in his interview with Dr. Siegel in early 2019. (*See, e.g.*, Siegel Dep. 61:2-62:12, 72:12-81:20, 91:22-92:3, 96:8-97:8, 98:8-101:9).[24]  Similarly, Plaintiff failed to disclose his workers' compensation claim to Dr. Siegel and to Defendants, wherein Plaintiff claimed carpal tunnel syndrome that rendered him unable to work (or able to work only limited jobs).  This information was directly responsive to discovery requests regarding mitigation and was clearly relevant to Plaintiff's economic damages claim, as witnessed by the fact that the claim was abandoned shortly after the revelation of the spurious workers' compensation claim. (*See* Def. Trial Ex. S; Dkt. #69, 73-12; *see also* Nov. 26, 2019 Hr'g Tr. 22:21-24:17).

Plaintiff's misconduct also included efforts to conceal the true nature of his claims in the Bronx Action.  Plaintiff submitted evidence in opposition to the instant motion demonstrating that he *did* disclose basic information about the Bronx Action to DSLG by mid-2019. (*See* Pl. Decl., Ex. R; *see also* Pl. Opp. 15-18).  However, Plaintiff's submissions also show him perpetuating the false narrative that the Bronx Action was solely against former counsel and had no relevance to the instant litigation.  For example, Plaintiff emailed DSLG to note that he intended to pursue intentional infliction of emotional distress damages — but he also specified that the case was to be brought against

---

[24]     In fact, Dr. Siegel testified that Plaintiff lied to him about his litigation history (*see* Siegel Dep. 58:6-59:20, 73:17-75:17, 105:6-106:18), and conceded that he would need to consider reevaluating his expert opinion after learning of the all of the information concealed from him by Plaintiff (*id.* at 142:18-143:3).  While Plaintiff's lies to his own expert are not themselves sanctionable, the Court agrees with Defendants that they are strong evidence of Plaintiff's scheme from the outset of this litigation to shape the record favorably by concealing unfavorable information.

Sewell over a fee dispute, thereby concealing the involvement of other litigants (such as Fordham) and failing to disclose that the emotional distress claims would explicitly conflict with those asserted here. (*See* Pl. Decl., Ex. P, R). Similarly, Plaintiff never corrected statements made by Mr. Cohen to the Court and Defendants to clarify that the Bronx Action included two appeals, litigants beyond Sewell, and emotional distress claims that conflicted with his claims in this case. (*See generally* Pl. Dep.; *see also* Pl. Decl., Ex. R).

Finally, Plaintiff's misconduct is evident from his deceptive and perjurious deposition testimony. Specifically, Plaintiff gave misleading testimony about the Bronx Action, volunteering that he had initiated the lawsuit against Sewell alleging fraud arising out of a dispute over attorneys' fees, and that he was in the process of appealing the dismissal of his suit against Sewell to the First Department. (Pl. Dep. 131:18-136:13; *see also id.* at 175:8-15, 272:7-17). Plaintiff conspicuously neglected to mention that: (i) he was also suing Fordham and other defendants; (ii) he was seeking to recover for intentional infliction of emotional distress; (iii) he was also actively pursuing an appeal as to the Fordham defendants; and (iv) his theory of the case in the Bronx Action (particularly on the issue of emotional distress damages) directly conflicted with his claims in this litigation.

In his opposition to the instant motion, Plaintiff states that "at the trial" he "was never going to say that in 2018, … Sewell's acts did not contribute to [his] health damages initially caused by Defendants[.]" (Pl. Decl. ¶ 15). However, this statement is directly contradicted by Plaintiff's deposition

testimony, wherein he testified that the Bronx Action had no impact on the

damages sought in this case:

> Q.  Is it still your testimony that your dispute with your former attorney has had no impact — has no impact on the emotional damage you claim to have suffered in this case?  …
>
> A.  It is unpleasant, but I believe it did not cause emotional damage.
>
> Q.  Did it cause you emotional suffering?  …
>
> A.  Not to the level of suffering.  But we don't like lawsuits, sure.

(Pl. Dep. 325:3-15).  In that same proceeding, Plaintiff affirmatively stated that

there were no other factors that contributed to his emotional distress:

> Q.  So my question to you is, are there other factors contributing to the alleged emotional distress that you claim to be suffering from?  …
>
> A.  The answer is no.

(*Id.* at 326:12-17).  Rather than suggesting that Plaintiff would come clean at

trial, and suddenly disclose that his emotional distress damages were

circumscribed by those attributable to the Bronx Action defendants, the record

instead suggests that Plaintiff would have persisted in seeking damages for the

same purported emotional distress in both cases and that he perjured himself

at his deposition to conceal that fact.  *See Burrell* v. *AT&T Corp.*, 282 F. App'x

66, 67 (2d Cir. 2008) (summary order) (affirming court's sanctioning of litigant

for, *inter alia*, "fail[ing] to disclose his involvement in a number of other

lawsuits in response to questions at his depositions" and "testif[ying to certain

facts] … at his deposition that [were] contradicted by sworn statements he made in connection with another lawsuit").

The efforts just described easily rise to the level of "willful noncompliance" in the context of Rule 37 sanctions, *Agiwal*, 555 F.3d at 302, as the record demonstrates that, among other misconduct, Plaintiff: (i) initially withheld unfavorable facts from his attorney; (ii) disclosed some of that information only after the Court compelled the production of his asylum application, revealing his deception; (iii) repeatedly advanced baseless legal arguments that the information he sought to conceal was irrelevant; (iv) misled the Court and his counsel as to the nature and scope of the Bronx Action; (v) lied to his own expert witness to ensure he received a favorable expert report; and (vi) perjured himself at his deposition.  It is equally obvious that Plaintiff's extensive campaign of obstruction and misinformation was waged for the improper purpose of precluding the introduction of any fact that could harm his case, no matter how relevant.

This misconduct persisted throughout the course of this case, and Plaintiff's subsequent compliance with certain of the Court's orders compelling production does not obviate the fact that Defendants were forced to file multiple motions to compel.  *Accord Nittolo* v. *Brand*, 96 F.R.D. 672, 676-77 (S.D.N.Y. 1983) ("Nor is it of any moment that, notwithstanding plaintiff's obstructive efforts, the defendants were still able to obtain some of the true facts.  The sanctions imposed by Rule 37 for obstructing or failing to comply with discovery procedures would be hollow indeed if they could be imposed

only on those whose efforts at concealment proved to be successful.").  With respect to the efficacy of lesser sanctions and whether Plaintiff had been warned that further obstruction would lead to sanctions, the Court believes that the years-long record of intentional obstruction, coupled with the Court's previous decisions to give Plaintiff and his counsel the benefit of the doubt in denying without prejudice past motions for sanctions (*see, e.g.*, Dkt. #65; Nov. 26, 2019 Hr'g Tr. 29:22-30:25), afforded Plaintiff sufficient notice and opportunity to comply with his discovery obligations.[25]

Turning to the imposition of sanctions under its inherent power, the Court finds that, considered as a whole, Plaintiff's conduct was entirely without color — as each motion to compel revealed that Plaintiff's legal arguments against disclosure were completely unsupported by the facts.  Plaintiff's misconduct led to extensive and unnecessary litigation in this case: after the disclosure of the workers' compensation claim, Plaintiff ceased to pursue economic damages (*see* Dkt. #69, 73-12; *see also* Nov. 26, 2019 Hr'g Tr. 22:21-24:17); after the revelation that Plaintiff lied to Dr. Siegel (which revelation, notably, emerged only after motion practice over Dr. Siegel's consulting fees), Plaintiff's counsel declined to call Dr. Siegel as a trial witness (*see* Feb. 25, 2020 Hr'g Tr. 12:5-13); and after a series of last-minute disclosures regarding

---

[25]    Indeed, Plaintiff to this very day continues to assert that he has done no wrong in obstructing discovery throughout the course of this litigation, maintaining that evidence of his medical history, mental health history, employment history, and litigation history has no relevance to his case (*see generally* Pl. Opp.; Pl. Decl.), despite multiple Court orders to the contrary.  The Court declines to reconsider its many decisions already addressing the relevance of the information and documents that Plaintiff attempted to shield from disclosure and that he continues to claim are not relevant.

the Bronx Action, Plaintiff dropped his emotional distress claims (Dkt. #99) and then voluntarily dismissed the case in its entirety (Feb. 28, 2020 Hr'g Tr. 6:4-18). Had Plaintiff disclosed relevant information in response to discovery demands at the outset, including the truth about the Bronx Action, it is certain that this litigation would have concluded years ago and at significantly less expense. *Cf. Hirschfeld* v. *Bd. of Elections in City of N.Y.*, 984 F.2d 35, 40 (2d Cir. 1993) ("Bad faith may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation.").

In sum, the Court believes sanctions are warranted to compensate Defendants for Plaintiff's "abuse [of] the judicial process." *Chambers*, 501 U.S. at 45; *see also Goodyear Tire & Rubber Co.* v. *Haeger*, — U.S. —, 137 S. Ct. 1178, 1186 (2017). The sanctions period for Plaintiff begins on May 2, 2019, the date Plaintiff responded to Defendants' initial discovery requests, wherein Plaintiff's first intentional act of misconduct — concealing relevant information from his attorney — was initially communicated to Defendants. The sanctions period continues through the voluntary dismissal of this case, on February 28, 2020, and it also includes the cost of Defendants' response to Plaintiff's *pro se* opposition to the instant motion.[26]

---

[26] Because DSLG did not oppose Defendants' motion for sanctions on Plaintiff's behalf (*see* DSLG Opp. 1 n.1) and because Plaintiff was not involved in litigating the instant motion until the March 17, 2021 conference where Plaintiff asserted his intent to oppose Defendants' motion *pro se*, the Court declines to sanction Plaintiff for the period between the voluntary dismissal of the case on February 28, 2020, and Plaintiff's appearance at the March 17, 2021 conference. For clarity, the Court specifies that the sanctions period for Plaintiff is from May 2, 2019, to February 28, 2020, and from March 17, 2021, to the present.

Because the Court sanctions Plaintiff and DSLG for the period of January 13, 2020, through the voluntary dismissal of Plaintiff's claims on February 28, 2020, and from March 17, 2021, to the present, Plaintiff and DSLG are jointly and severally liable for fees and costs covering those periods.

**CONCLUSION**

For the foregoing reasons, Defendants' motion is GRANTED. Defendants may submit to the Court, within 30 days of the date of this Opinion, contemporaneous billing records, other documented expenses, and supporting papers in support of an award of fees and costs. Plaintiff and DSLG may each file an opposition, if any, within 30 days of Defendants' submission. Defendants may file a single response within 14 days of receiving the later of Plaintiff's or DSLG's opposition. The Clerk of Court is directed to terminate the motions pending at docket entries 116 and 125. The Clerk of Court is further directed to lift the stay previously imposed on March 17, 2021 (*see* Minute Entry for March 17, 2021), and to restore this case to the active docket.

SO ORDERED.

Dated:     July 1, 2021
           New York, New York

_____
            KATHERINE POLK FAILLA
            United States District Judge